Mary CLARK, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C85–97TB.

United States District Court, W.D. Washington.

April 20, 1987.

G. Lee Raaen and Ann Cross Eschenbach, Seattle, Wash., for plaintiff Clark.

David Lord, Ferguson & Burdell, Seattle, Wash., for plaintiff Nojd.

Robert N. Kelly, JoAnn J. Bordeaux, Gail Killefer, and William E. Michaels, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRYAN, District Judge.

THIS MATTER having come on before the undersigned Judge of the above-entitled Court for trial, and the Court having heard the oral testimony presented, having reviewed the documentary evidence admitted, having heard oral argument from all parties, and being otherwise fully advised in the premises, now, therefore, enters the following:

## FINDINGS OF FACT

1.

The Court's oral decisions on December 22, 1986, December 23, 1986, and January 7, 1987, attached hereto, are incorporated by this reference as though fully stated herein.

2.

Plaintiffs Edwin Nojd and Genevieve Nojd are husband and wife, and the parents of plaintiffs Marta Vinnedge and Norma Crouse. Norma Crouse is presently a resident of Spanaway, Washington, and Marta Vinnedge is presently a resident of Seattle, Washington.

3.

Plaintiff Mary Clark, a single woman, is the widow of Harvey Clark and the mother of plaintiff Janice Butler. Janice Butler is the mother of minor plaintiffs Alan McArthur and Aaron Frank. Plaintiff John Gravatt, a single man not related to the other plaintiffs, has been a tenant on the Clark property since 1977.

4.

Plaintiffs Edwin and Genevieve Nojd are the owners of approximately five (5) acres of land ("Nojd Property") in American Lake Gardens, an unincorporated area south of Tacoma, Pierce County, Washington. American Lake Gardens borders on McChord Air Force Base, an installation owned and operated by defendant United States of America. Since 1947, Edwin and Genevieve Nojd have resided on the Nojd Property, the legal description of which is as follows:

Parcel 1, acquired June 12, 1957: Beginning on the North line of Section 23, Township 19 North, Range 2 East, W.M. at a point 467.85 feet East of the Northwest corner thereof, thence on a line if continued would intersect the East and West centerline of said Section 23, at a point 488.28 feet East of the quarter section of the West side of said section, South 32.18 feet to the true place of beginning for this description; thence continuing on said line South 600 feet, thence East at right angles to the last course 330; thence North at right angles to the last course 600 feet; thence West 300 feet to the true place of beginning, in Pierce County, Washington.

Parcel 2, acquired April 13, 1967: Beginning at a point 712.85 feet East of the Northwest corner of Section 23, Township 19 North, Range 2 East of W.M., thence South 32.18 feet to the point of beginning; thence South 600 feet; thence East 85 feet, thence North 600 feet, thence West 85 feet to point of beginning; in Pierce County, State of Washington.

5.

There are three residences on the Nojd Property: 6507—146th Street S.W.; 6511—146th Street S.W.; 6419—146th Street S.W. Edwin Nojd, Genevieve Nojd and Norma Crouse resided at 6507—146th Street S.W. from 1947 through January 1963. Marta Vinnedge resided at 6507—146th Street S.W. from April 1951 through January 1963. From January 1963 until the present, Edwin and Genevieve Nojd have resided at 6511—146th Street S.W. Norma Crouse resided at that address from January 1963 until 1966, and from 1970 until 1971. Marta Vinnedge resided at that ad-

dress from January 1963 until 1969, from 1973 until 1978, and from 1979 to 1980.

### 6.

Marta Vinnedge and Norma Crouse have been frequent and regular visitors to their parents' property, and during the course of such visits have consumed water on a frequent and regular basis. One well on the Nojd Property provides water to 6419 and 6507—146th Street S.W., and a second well provides water to 6511—146th Street S.W. The two wells are approximately 200 feet apart. Edwin Nojd, Genevieve Nojd, Norma Crouse and Marta Vinnedge have all at various times consumed water from wells on the Nojd Property serving 6511—146th Street S.W. and 6507—146th Street S.W. On occasion, water from the well serving the residences at 6507 and 6419—146th Street has been pumped directly to the Nojd residence at 6511—146th Street, the last such instance after 1980. A relative resided at 6507—146th Street until 1970, and all Nojd plaintiffs visited regularly and consumed water while so doing.

### 7.

Plaintiff Mary Clark is the owner of approximately ten (10) acres of land ("Clark Property") in American Lake Gardens, said property legally described as follows:

East five (5) acres of the following described property: Beginning on the North line of Section 23, Township 19 North, Range 2 East, W.M., at a point 797.83 feet East of the Northwest corner of said section; thence on a line which if continued would intersect the East and West centerline of said section at a point 818.28 feet East of the quarter corner of the West side of said section South 632.09 feet; thence at right angles to the last course East 324.19 feet; thence with the same meridian of reference, North 68°03′00″ East 184.30 feet; thence North 73°06′00″ East 172.32 feet; thence North 514.28 feet to North line of Section 23, at a point 1,457.85 feet East of the Northwest corner thereof; thence on said North line West 650 feet to the point of beginning.

Also beginning on the North line of Section 23, Township 19 North, Range 2 East, W.M. at a point 1457.85 feet East of the Northwest corner of said section; thence on a line which if continued will intersect the East and West center of said section at a point 1478.28 feet East of quarter section corner on the West side of said section South 514.28 feet; thence with same meridian of reference North 73°6′00″ East 332.49 feet; thence North 64°51′00″ East 143.85 feet; thence North 355.05 feet to the North line of Section 23, at a point 1906.20 feet East of the Northwest corner of said section; thence on said North line West 448.35 feet to point of beginning except roads; situate in the County of Pierce, State of Washington.

### 8.

The Mary Clark property contains: A main residence (6117—146th Street S.W.); a rental house (6107—146th Street S.W.); a duplex located at 6111–6113—146th Street S.W.; a garage; and a stable with a tack room. Mary Clark has resided at 6117—146th Street S.W., Tacoma, Washington from 1948 to the present. John Gravatt has resided on the Clark property from 1977 to the present. Janice Butler resided on the Clark property from 1950 through 1968, from 1969 to 1975, from 1977 to 1981 and from August 1985 to the present. Allen McArthur was born in 1969 and Aaron Frank in 1976. They have resided on the Clark property when their mother (Butler) did so. The plaintiffs consumed well water while residing on the property until 1983.

### 9.

The Nojd property located at 6507—146th Street S.W. has been rented to tenants since 1963. The Nojd property located at 6419—146th Street S.W. has been rented to tenants since 1975.

### 10.

Prior to the discovery of contaminated water in 1983, plaintiff Mary Clark had tenants residing on her property in her rental units. Since 1983, John Gravatt has remained as a tenant; Janice Butler and her two children became tenants in August 1985. Mary Clark would not accept rent from John Gravatt after they were advised

not to use the well water for drinking or cooking in March 1983, although he offered to continue paying rent. Janice Butler and her family have not paid rent since they moved to the property in August 1985.

11.

Since 1938, the defendant United States of America has operated a military reservation known as McChord Air Force Base ("McChord") at Pierce County, Washington. Over a period of years, the defendant has disposed of some part of its waste materials at landfill sites and burn pits on McChord.

12.

In December 1982 or January 1983, plaintiff Mary Clark notified Air Force officials at McChord that she was concerned her water might be contaminated. The Air Force did not respond to her concerns in a manner which was satisfactory to Clark. Thereafter, plaintiff Clark contacted the Tacoma-Pierce County Health Department to sample her water drawn from wells on her property. The Tacoma-Pierce County Health Department contacted the EPA, which actually tested Clark's well water for contamination in late January 1983. Clark was advised not to consume the water while waiting for the EPA's test results. After the EPA had received water test results from the Clark property in March 1983, Mary Clark, her family and tenants were advised not to consume water drawn from wells on the Clark Property.

13.

The two wells providing a domestic water supply to the Nojd Property were tested by the EPA in March of 1983. After the results were received by the EPA, Edwin and Genevieve Nojd and their tenants were advised not to consume water drawn from these two wells. Marta Vinnedge and Norma Crouse were informed by their parents of the contamination and of the advice concerning consumption of water.

14.

In May 1983, after the well water on the Nojd and Clark Properties had been analyzed by the EPA, Edwin Nojd, Genevieve Nojd, Mary Clark, John Gravatt and Janice Butler were immediately informed by representatives of the Tacoma Pierce County Health Department that their water supplies contained trichloroethylene ("TCE"), a possible carcinogen. The remaining plaintiffs received the same information soon thereafter.

15.

It is stipulated that the contaminants trichloroethylene ("TCE"), and a derivative of TCE; 1, 2 trans dichloroethylene ("DCE") have been found in wells on the Nojd Property in the following amounts on the dates indicated:

#### 6419 – 146th S.W.

| Date | DCE | TCE |
|------|-----|-----|
| 5/21–2, 1984 | / | / |
| 8/28–9, 1984 | / | / |
| 10/23, 1984 | / | / |
| 11/27, 1984 | / | |
| 1/28–9, 1985 | No results | No results |
| 2/20, 1985 | / | / |
| 4/8–9, 1985 | 14.1 | 7.9 |
| 4/23, 1985 | / | / |

#### 6507 – 146th S.W.

| Date | DCE | TCE |
|------|-----|-----|
| 5/21–22, 1984 | 17 | 7.7 |
| 8/28–9, 1984 | 12.4 | 8.9 |
| 10/23, 1984 | / | / |
| 11/27, 1984 | No results | No results |
| 1/28–9, 1985 | NC | NC |
| 2/20, 1985 | / | / |

| Date | DCE | TCE |
|---|---|---|
| 4/8–9, 1985 | / | / |
| 4/23, 1985 | 16.5 | 9.2 |

### 6511 – 146th S.W.

| Date | DCE | TCE |
|---|---|---|
| 5/21–22, 1984 | 2.3 | ND |
| 8/28–9, 1984 | 0.3 | ND |
| 10/23, 1984 | / | / |
| 11/27, 1984 | No results | No results |
| 1/28–9, 1985 | TR | ND |
| 2/20, 1985 | / | / |
| 4/8–9, 1985 | / | / |
| 4/23, 1985 | 1.7 | ND |

In the above representation, concentrations are in micrograms per liter (ug/1), the slash (/) means "no sample," "ND" means "none detected," "TR" means "trace," "NC" means "not confirmed," and "no results" means "sample exceeded holding time."

16.

It is stipulated that TCE and DCE have been discovered in wells on the Clark Property in the following amounts on the dates indicated:

### 6117 – 146th S.W., Tacoma, Washington

| Date | Testing Agency | TCE | Well ID & Sample Depth | DCE | Well ID & Sample Depth |
|---|---|---|---|---|---|
| 2/1/83 | EPA | 7.9 | N | 66 | N |
| | | 12.0 | S | 33 | S |
| 4/18/83 | USAF | 8.9 | N | 83 | N |
| | | 10.8 | S | 36.7 | S |
| 5/31/83 & 6/1/83 | EPA | 10 | | 155 | |
| 6/22/83 | EPA | 7.5 | 30 ft. | 55.0 | 30 ft. |
| | | 15.0 | 32 ft. | 114.0 | 32 ft. |
| | | 5.4 | 35 ft. | 169.0 | 35 ft. |
| | | 5.8 | 37 ft. | 180.0 | 37 ft. |
| | | 6.2 | 40 ft. | 193.0 | 40 ft. |
| | | 2.1 | 42 ft. | 88.0 | 42 ft. |
| 6/23/83 | EPA | 1.2 | 45 ft. | 50.0 | 45 ft. |
| | | 1.M | 47 ft. | 31.0 | 47 ft. |
| | | 1.M | 50 ft. | 11.0 | 50 ft. |
| | | 1.U | 52 ft. | 8.1 | 52 ft. |
| 6/27/83 | EPA | 1.U | 92 ft. | 1.U | 92 ft. |
| | | 1.U | 97 ft. | 1.U | 97 ft. |
| | | 1.M | 100 ft. | 3.5 | 100 ft. |
| 12/20/83 | USAF | 9.6 | | 23.1 | |
| 1/24/84 – 2/2/84 | EPA (by E&E) | – | W1B | 8.4 | W1B |
| | | 10 | W1C | 123.0 | W1C |
| 5/21/84 – 5/2/84 | USAF | 5.7 | | 14.0 | |
| 8/28/84 – 8/29/84 | USAF | 9.2 | | 13.5 | |
| 11/27/84 | USAF | No results | | No results | |
| 12/11/84 | USAF | 0.7 | W1A | 2.5 | W1A |
| | | 2.3 | W1B | 18.7 | W1B |
| | | 13.7 | W1C | 24.7 | W1C |

| Date | Testing Agency | TCE | Well ID & Sample Depth | DCE | Well ID & Sample Depth |
|------|----------------|-----|------------------------|-----|------------------------|
| | | ND | W2A | ND | W2A |
| | | ND | W2B | ND | W2B |
| | | 0.5 | W3A | 3.2 | W3A |
| | | 0.5 | W3B | 0.4 | W3B |
| | | 1.0 | W4A | 5.9 | W4A |
| | | 7.3 | W4B | 30.7 | W4B |
| | | 2.7 | W4C | 12.1 | W4C |
| 1/30/85 | USAF | 1.2 | | 3.3 | |
| 2/14/85 | USAF | 8.2 | | NR | |
| 6/11/85 | Am Test | 19 | W1C–40 ft. | 50 | W1C–40 ft. |
| | | 1.0 | W1B–78 ft. | 30 | W1B–78 ft. |
| 6/11/85 | USAF | 1.0 | W1B–78 ft. | 14 | W1B–78 ft. |
| | | 7.9 | W1C–40 ft. | 70.0 | W1C–40 ft. |
| | | ND | W2A–38 ft. | ND | W2A–38 ft. |
| | | ND | W1B–19 ft. | ND | W1B–19 ft. |
| | | ND | W3A–43 ft. | NC | W3A–43 ft. |
| | | 3.2 | W3B–15 ft. | NC | W3B–15 ft. |
| | | ND | W4A–117 ft. | ND | W4A–117 ft. |
| | | 2.8 | W4B–74 ft. | 11.0 | W4B–74 ft. |
| | | 3.8 | W4C–35 ft. | 28.0 | W4C–35 ft. |
| 6/11/85 | USAF QC | 15 | W1C–40 ft. | 61 | W1C–40 ft. |
| | | ND | W4A–117 ft. | ND | W4A–117 ft. |
| 6/17/85 | USAF QC | 3.2 | W3B–15 ft. | NC | W3B–15 ft. |
| 7/9/85 | USAF | 14 | W1C–40 ft. | 27 | W1C–40 ft. |
| | | NC | W3A–43 ft. | NC | W3A–43 ft. |
| | | ND | W4A–117 ft. | ND | W4A–117 ft. |
| 7/9/85 | USAF QC | ND | W2B–19 ft. | ND | W2B–19 ft. |
| | | ND | W4A–117 ft. | ND | W4A–117 ft. |
| 7/12/85 | USAF | NC | W1B–78 ft. | 23 | W1B–78 ft. |
| | | ND | W2A–38 ft. | ND | W2A–38 ft. |
| | | ND | W2B–19 ft. | ND | W2B–19 ft. |
| | | 3.5 | W3B–15 ft. | NC | W3B–15 ft. |
| | | NC | W4B–74 ft. | 5.1 | W4B–74 ft. |
| | | 5.0 | W4C–35 ft. | 32 | W4C–35 ft. |
| 7/12/85 | USAF QC | NC | W1B–78 ft. | 20 | W1B–78 ft. |
| 7/12/85 | USAF | NC | W1B–78 ft. | 23 | W1B–78 ft. |
| | | 7.9 | W1C–40 ft. | 70 | W1C–40 ft. |
| | | ND | W2A–38 ft. | ND | W2A–38 ft. |
| | | ND | W2B–19 ft. | ND | W2B–19 ft. |
| Undated | EPA (Sample No. J2124) | 26 | W1C-depth unknown | 20 | W1C-depth unknown |

Results expressed in micrograms per liter
Well depths noted when available
USAF = United States Air Force
EPA = Environmental Protection Agency
E&E = Environmental and Ecology, Inc., an EPA contractor
Am Test = Am Test, Inc.
N = North well
S= South well
U = below one microgram
M = detected at less than 1 microgram per liter but quantification at this level is unreliable

ND = none detected
NC = none confirmed
NR = unable to confirm; please submit another sample

---

**17.**

It is stipulated that iron has been found in the wells on the Clark Property in concentrations of 4410 (north well) and 2480 (south well) on February 1, 1983; and 4648 on May 31, 1984; and 2297 on February 14, 1985. All concentrations referenced are in micrograms per liter.

**18.**

TCE and DCE are classified by the United States Environmental Protection Agency and the State of Washington as extrahazardous substances. The EPA's recommended contaminant level for TCE is zero micrograms per liter, and it is classified by the EPA as a probable human carcinogen. The EPA's maximum contaminant level for TCE is 5 micrograms per liter, and the "action level" for the Tacoma-Pierce County Health Department is 2.7 micrograms per liter. The EPA's recommended maximum contaminant level for DCE is 70 micrograms per liter for lifetime exposure.

The EPA's recommended contaminant level for TCE is zero because as a matter of public policy EPA sets recommended levels at zero for any chemical classified as a probable human carcinogen. The maximum contaminant level, in contrast, is set by balancing public health concerns with factors such as the costs associated with preventing or cleaning up contamination. The Tacoma-Pierce County Health Department's "action level" for TCE was set at the estimated 1 in 1 million excess death level; in other words, the concentration which, if consumed over a lifetime of 70 years, would cause one excess death in a population of one million people.

**19.**

There is ongoing research concerning the potential health hazards of TCE, but there have not been conclusive studies conducted on the carcinogenicity of this contaminant. One study by the National Cancer Institute, and a followup study by the same group, did find an elevated incidence of liver tumors among a certain strain of laboratory mouse which has an inherent propensity to develop liver tumors. Other animal studies have failed to show any association between exposure to TCE and cancer.

**20.**

A complete "clean-up" of TCE ground water contamination on the property at issue has not, to date, been successfully accomplished. It is possible to remove TCE from a water supply system, such as is now being done with Tacoma's municipal water supply; but it may not be possible to prevent TCE from leaching into an underground water aquifer.

**21.**

It is stipulated that the contaminants at issue (TCE, DCE and iron) which have been found in plaintiffs' wells originate from past disposal of hazardous waste on McChord at sites underneath the present golf course (golf course landfill and burn pit sites).

**22.**

The defendant had exclusive control of these waste disposal facilities. These golf course sites were operated from 1951 through the 1960s. TCE disposed of at the golf course sites has leached and may still be leaching into the groundwater beneath these sites, and has migrated and may still be migrating down gradient to the Nojd and Clark properties. TCE and DCE have polluted domestic water supplies of the Clark and Nojd properties. Iron originating from the golf course landfill sites has made the Clark well water unsightly and has damaged plumbing fixtures and pipes.

**23.**

After being advised that their water was contaminated in March 1983, Edwin and Genevieve Nojd decided to provide their own domestic water supply by hauling water from other sources. This continued until the spring of 1984. Thereafter, Edwin and Genevieve Nojd were provided bottled water by the defendant until their property was connected to the public water supply in July 1986. Mary Clark and her tenant plaintiffs provided their own domes-

tic water by hauling water from other sources until the spring of 1984, after which they were provided bottled water by the defendant until their property was connected to a public water supply in August 1986.

24.

At no time since Edwin Nojd and Genevieve Nojd were notified that their water contained a possible human carcinogen have they, Marta Vinnedge or Norma Course consumed water drawn from wells on the Nojd Property. Well water has been used for quick showers and washing dishes.

25.

Mary Clark and the plaintiffs on her property have not consumed any water drawn from wells on the Clark Property since they were notified that the water contained a possible human carcinogen. Mary Clark did not use the well water for baths, showers or washing. Other plaintiffs on the Clark property made only limited occasional use of well water for non-drinking purposes after the contamination was discovered.

26.

The EPA began an immediate investigation into the water contamination of American Lake Gardens in the spring of 1983. In March 1984, the EPA determined that a possible source of the contamination was McChord. The EPA tendered responsibility for the pollution, and its cleanup, to the United States Department of Defense in 1986.

27.

The defendant continued until December of 1985 to deny that available facts proved conclusively that it was the sole source of the contamination at American Lake Gardens.

28.

The EPA has declared American Lake Gardens to be a "Superfund Site," a designation given to sites with serious contamination. Of the approximately 367 Superfund Sites nationwide in August 1984, the American Lake Gardens site was third or fourth from the bottom of the list of priorities. There were a total of ten sites in the State of Washington, three or four of them in the Tacoma area.

29.

In August 1982 the results of a preliminary study prepared by an Air Force contractor and based on interviews and document research only, indicated that the landfill site on the golf course might contain potentially harmful wastes and that if that were true there would be a high potential for groundwater contamination and migration off base. This preliminary study was followed by actual field work, and the results of this study by another Air Force contractor were released in 1985. The results confirmed that the landfill site was the probable source of the contamination found by the EPA at American Lake Gardens in March 1983.

30.

TCE is a cleaning solvent which was used for various purposes at McChord. Prior to 1950, the substance was known as dangerous and poisonous in occupational settings involving sustained exposure to high concentrations of TCE, but specific adverse health effects resulting from chronic exposure were not generally understood. Prior to 1950 it was generally known that TCE was not fit to consume and that it should not be in a water supply. The defendant was or should have been aware that substances such as TCE should not be in a water supply.

31.

DCE is a "break-down" product of TCE, and the presence of DCE in groundwater tends to indicate that TCE has been present in the groundwater for an extended period of time.

32.

Prior to 1950, it was common knowledge that groundwater could be polluted and that the pollution could travel great distances from the site of the original contamination. Further, it was generally known prior to that time that percolation, a process by which substances disposed of would leach into the underlying groundwater, could occur and that groundwater

needed to be protected from deleterious leachates.

### 33.

The appropriate standard of care in waste disposal in the 1950s was to treat TCE as a hazardous substance in disposing of the contaminant so as not to pollute groundwater.

### 34.

The defendant had certain manuals (Trial Exhibits 21, 22, 23, 24, 46 and 89) which had the force and effect of government regulations, and which set out the standards and requirements governing waste disposal on military installations. These manuals made it mandatory that the effect on groundwater be considered when siting and operating waste disposal facilities on military installations. For example, plaintiffs' Trial Exhibit 21 (AFM 88–11 Chapter 5, § 504C) requires that the location of the fill should be such that run-off can be disposed of without polluting surface or sub-surface water supplies. Plaintiffs' Trial Exhibit 46 (War Department Technical Manual 5–634, October, 1946, § III), sets forth the mandatory requirement not to select sites which have surface or sub-surface drainage to the water supply. Plaintiffs' Trial Exhibit 23 specifically requires that waste disposal must not contribute to a public nuisance, with specific reference to water. Other Air Force manuals in evidence as trial exhibits similarly convey a policy on the part of the Air Force to avoid contamination of groundwater.

### 35.

Aircraft fuel, oils, cleaning fluids, hydraulic fluids, and similar wastes, some probably containing TCE, were disposed of by burning in burn pits. Effluent from garbage, paint, liquid wastes or materials easily converted into liquid wastes, which probably included TCE, were disposed of at the landfill.

### 36.

The defendant did not segregate materials nor inspect them with a requisite degree of care before disposing of refuse in the golf course landfill sites. There were no special precautions or instructions to persons hauling refuse, and there was no close control over what type of materials were to be placed in the dump sites. The dump sites were not always covered and standing water would occasionally appear in the excavation.

### 37.

Air Force policy and regulations required that disposition of liquid hazardous waste, such as TCE, be done by private contractor in a salvage operation off base. However, on frequent occasion, without record-keeping, some unknown amount of TCE was disposed of at the golf course landfill and burn pit sites. Every Friday Air Force employees would place unseparated, non-segregated liquid waste which commonly included TCE, in these pits for various periods of time, sometimes exceeding one day, before burning it. Because burn times were sometimes delayed and because one golf course burn pit was sited on gravel, it is reasonable to conclude that some of the liquid waste would percolate into the ground prior to burning. The effect of the possible contamination of underlying groundwater was not considered at the time that these burn pits were established, although the Air Force's own regulations made such consideration mandatory, and despite the fact that relevant Washington State Administrative Code provisions dictated that the location of burn pits had to be such as to prevent pollution of underlying groundwater.

### 38.

The defendant knew or should have known that the disposal of liquid wastes such as TCE at landfill sites, or pouring of liquid wastes into burn pits, could result in groundwater contamination.

### 39.

Relevant Air Force manuals set out standards and requirements for the siting and operation of sanitary land fills and burn pits at McChord. These manuals contain a mandatory requirement that the presence of groundwater and the possible effects on groundwater must be considered in the siting and operation of dumps and burn pits on an Air Force Base. Despite these clear directives, defendant deviated from these

standards by siting landfills and burn pits in areas susceptible to water contamination, and failing to consider the effects on groundwater in the siting and operation of the subject landfills and burn pits.

40.

The contamination of plaintiffs' well water resulted because the dump sites and burn pits were not sited or operated in accordance with government regulations.

41.

It is probable that if the defendant had reasonably considered the effect of such landfill siting on the underlying ground water, as was required by the Air Force regulations, the contamination of plaintiffs' groundwater would not have occurred.

42.

The laws and public policy of the State of Washington, as reflected in R.C.W. 70.54.-010 and R.C.W. 90.48.010–.080, and in 1960's standards for water quality as set forth in W.A.C. 372–12–030, is that all persons have a strong duty to avoid polluting natural groundwater. This public policy is intended to maintain the highest possible standards to insure the purity of all waters of the state.

43.

The acts and omissions of the defendant in siting and operating the dump sites and burn pits on McChord deviated from the appropriate standard of care; that is, defendant failed to exercise ordinary care. Defendant's acts included acts which a reasonably careful person would not do under the same or similar circumstances. Defendants omissions included omissions which a reasonably careful person would not have omitted under the same or similar circumstances. Defendants acts and omissions were proximate causes of plaintiffs' damages.

44.

The defendant has not shown justification or excuse for its failure to abide by the laws and public policy of Washington which prohibit contamination of a water supply; such failure was not due to any cause beyond defendant's control which ordinary care could not have guarded against.

45.

The plaintiffs have not met their burden of proving common law negligence. However, the plaintiffs have met their burden of showing that the defendant violated the relevant Washington statutes, Washington administrative regulations, and Air Force manuals having the force of regulations; that these violations were a proximate cause of the contamination of plaintiffs' well water; therefore, that the defendant was negligent. The defendant has not advanced sufficient justification for its acts for this Court to excuse defendant's negligence.

46.

The determination to have dumpsites on McChord was discretionary with the defendant. This discretion was, however, limited by the Air Force manuals which required that the effect on groundwater be considered in making decisions regarding the siting and operation of landfills.

47.

It was not discretionary for the defendant to fail to consider the effect on groundwater of siting and operating the dump sites and burn pits.

48.

There was no voluntary act or contribution on the part of plaintiffs to the contamination of their respective properties by TCE or DCE.

49.

It was foreseeable that the siting and operation of the golf course landfill and burn pits without consideration for potential groundwater pollution could result in the contamination of plaintiffs' property and could cause injury to the plaintiffs.

50.

By its pollution of plaintiffs' groundwater the defendant has caused damage to the plaintiffs and to the property of the plaintiffs.

51.

The negligence of the defendant proximately caused a diminution in the value of plaintiffs' property. Since under the laws of the State of Washington a willing buyer

would have to be informed of the contamination, this information would result in a "chilling effect" on the value of the property because a buyer would pay less for contaminated property than for uncontaminated land.

52.

Although all plaintiffs have now been connected to a public water supply, due in primary part to the efforts of defendant, the value of the property connected to a public water supply is not substantially different from the value of the same property utilizing private wells, and connecting the plaintiffs' properties to the Lakewood Water District did not confer any additional special benefit on the properties.

53.

The negligence of the defendant proximately caused a decrease in rental income to plaintiffs. Edwin and Genevieve Nojd lost $915 rental income from tenants as a result of a need to lower the rent due to the lack of potable water. Mary Clark suffered a loss of twenty percent (20%) rental value for each of her three rental units for forty-one months, for a total amount of rental loss of $4,920. The twenty percent rental loss is determined with full recognition of Mary Clark's efforts, or lack thereof, to mitigate damages.

54.

By the contamination of the plaintiffs' property which was proximately caused by defendant's negligence, the value of plaintiff's property has been diminished by an undivided twelve and one-half percent (12½%) of the total value of plaintiffs' real property. This results in a loss of value to the Nojd property, appraised without pollution at $200,000.00, of $25,000.00. Loss to the Clark property, appraised without pollution at $215,000.00, is $26,875.00.

55.

The negligence of the defendant was a proximate cause of damage to the plumbing of the Clark properties in an amount of $7,500.00.

56.

The negligence of the defendant proximately caused Mary Clark to purchase water in an amount of $92.00.

57.

The negligence of the defendant on McChord did not proximately cause the physical injuries sustained by plaintiffs Mary Clark and Janice Butler which occurred when they were hauling water to their residences.

58.

The negligence of the defendant proximately caused inconvenience to all plaintiffs residing in American Lake Gardens after the spring of 1983.

59.

For approximately one year, Edwin Nojd obtained water for his property one or two times per week, with each trip taking one or one and one-half hours. With his time reasonably valued at $5 per hour, Edwin Nojd is entitled to compensation of $520.00. Plaintiff Mary Clark should similarly be awarded compensation of $520.00 for her efforts in obtaining water.

60.

The negligence of the defendant on McChord proximately caused the plaintiffs daily problems with having contaminated tap water. Under the circumstances here presented, reasonable compensation for lack of tap water and resulting inconvenience is $5.00 per day per person for the plaintiffs Nojds, Clark, and Butler. Plaintiffs Edwin and Genevieve Nojd are each entitled to $5,925.00 for the period of time for which they did not have pure tap water. Plaintiff Mary Clark is entitled to $6,150.00 for the period of time for which she did not have pure tap water. Plaintiff Janice Butler is entitled to $1,825.00 for the period of time for which she did not have pure tap water. Alan McArthur and Aaron Frank are each entitled to $40.00 per month for being deprived of pure tap water and resulting inconvenience, an amount totalling $480.00 each. Plaintiff John Gravatt is entitled to $2.50 per day for the period of time that he was deprived of tap water and for resulting inconvenience, an amount of $3,075.00.

61.

The negligence of the defendant proximately caused each of the plaintiffs to suf-

fer emotional distress as a result of their belief they may have consumed contaminated water, said belief having been caused or contributed to by the statements of defendant's agents.

62.

The perceived risks of the plaintiffs, although reasonable under the circumstances, were greater than the actual risks, if any, in having consumed the contaminated water. The plaintiffs were not exposed to any actual risk greater than 1 in 1 million. The actual risk was probably much less, and may be zero.

63.

The emotional distress caused to each plaintiff was within the foreseeable nature of the harm resulting from the defendant's acts and omissions on McChord.

64.

The plaintiffs' reactions were those of reasonable people similarly situated and normally constituted. Each plaintiff's emotional distress is of the type of mental suffering that is reasonable under the circumstances of having consumed water they suspected was contaminated.

65.

Each plaintiff displayed objective symptoms of emotional distress. The objective symptoms were of the type and kind that could be sensed or seen.

66.

Each plaintiff will continue to suffer emotional distress for some relatively short, but indefinite, period of time, but the plaintiffs have now all been informed of the actual health risks, if any, involved in consuming the contaminated water and such information should alleviate their emotional distress in time.

67.

The acts and omissions of the defendant proximately caused each plaintiff emotional distress, and reasonable compensation for such emotional distress is awarded in the following amounts: Genevieve Nojd, $25,000.00; Edwin Nojd, $15,000.00; Marta Vinnedge, $5,000.00; Norma Crouse, $5,000.00; Mary Clark, $25,000.00; Janice Butler, $5,000.00; Aaron Frank, $1,000.00;

Alan McArthur, $1,000.00; and John Gravatt, $1,000.00.

From the foregoing findings of fact, the Court now makes the following:

## CONCLUSIONS OF LAW

1.

This Court has jurisdiction over the parties and the subject matter of this action.

2.

This action was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 ("FTCA"). The FTCA is a limited waiver of sovereign immunity which defines the terms, conditions and scope of the sovereign's consent to tort suits for money damages. Subject to the reservations of sovereign immunity found in the FTCA, the Act grants the federal district courts exclusive jurisdiction over civil actions for personal injury or death caused by the negligent or wrongful act or omission of any government employee acting within the scope of his or her employment, in circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

3.

Among the reservations of sovereign immunity found in the FTCA is the discretionary function exception, 28 U.S.C. § 2680(a), which provides that the waiver of sovereign immunity does not encompass claims based upon a federal agency or government employee's exercise or performance, or failure to exercise or perform, a discretionary function or duty, whether or not the discretion involved is abused.

4.

The common law torts of employees of federal agencies are not within the scope of acts intended for exemption under 28 U.S.C. 2680(a).

5.

In an action under the Federal Tort Claims Act, the question whether the plaintiff's complaint states a cause of action is to be determined according to the law of

the state in which the injury sought to be made a basis of recovery was sustained. If plaintiff can show the federal agency also failed to follow its own regulations, such failure is relevant in assessing whether there was a breach of duty to the plaintiff which constitutes negligence per se.

6.

Relevant Air force manuals set out standards and requirements for the siting and operation of land fills and burn pits at McChord. Although the determination to have a landfill is a discretionary function, these manuals, including Exhibits 21, 22, 23, 46 and 88, contained planning and operational requirements that were not discretionary. It was mandatory that the presence of groundwater and the possible effects on groundwater must be considered in the siting and operation of landfills and burn pits. Consideration of the effects on groundwater was not discretionary within the meaning of 28 U.S.C. § 2680(a), but was a mandatory requirement.

7.

The defendant had a duty, the same duty attributable to a private person, to follow various Washington state statutes and Washington Administrative Code regulations concerning water pollution. This duty was recognized in applicable Air Force manuals.

8.

RCW 70.54.010, 7.48.140(2), 90.48.010 —.020 and -.080, and WAC 372–12–010 —.030 set out the law and public policy of the State of Washington with respect to water pollution. These statutes made it incumbent upon all persons in the State of Washington to maintain the highest standards in water quality. Read together, the referenced statutes and regulations set forth a standard of care which banned those acts which would cause or tend to cause pollution of groundwater.

9.

The above-referenced Washington statutes and regulations, as effective during the 1950's and 1960's, were concerned with future pollution of groundwater, as well as present pollution.

10.

R.C.W. 90.48.010 required that the Air Force use all known available and reasonable methods to prevent pollution to groundwater, and the Air Force did not comply with this statute.

11.

Underground water is among the types of water protected by the applicable Washington statutes. Substances which the statutes forbid to be discharged in such a way as would pollute or tend to pollute groundwater include the chemical TCE.

12.

The Washington Administrative Code, as effective in the 1950's, and 1960's, adopted standards for waste oil disposal in WAC 372–16–130. Defendant disposed of TCE and waste oil mixed together at burn pits on McChord. The pertinent Washington Administrative Code provisions dictated that the location of these burn pits had to be such as to prevent any possible pollution of underlying groundwater.

13.

The statutes and regulations of the State of Washington, as well as defendant's own regulations, made it mandatory for the defendant to consider the effect of groundwater in selecting and operating waste disposal facilities on McChord.

14.

The plaintiffs have established by a preponderance of the evidence that the defendant's conduct resulting in plaintiffs' injury was not the type of conduct sought to be protected by the United States Congress in its adoption of the Federal Tort Claims Act "Discretionary Function Exception," 28 U.S.C. § 2680(a).

15.

The statutes and regulations of the State of Washington, as well as the government's own regulations, set forth the appropriate standard of care with respect to the siting and operation of the landfill sites and burn pits at McChord.

16.

The appropriate standard of care for disposal of liquid hazardous waste in the

1950's and 1960's was to dispose of liquid contaminants by means other than in sanitary landfills or open dump pits.

17.

The defendant had a duty to refrain from disposing of TCE in a manner such as to result in contamination of the groundwater beneath McChord, and subsequently the groundwater of American Lake Gardens. This duty extended to all plaintiffs.

18.

By its conduct in disposing of TCE in a manner inconsistent with its own regulations and in derogation of the reasonable standard of care for disposal of such a contaminant, the defendant proximately caused actual damage to the plaintiffs by the pollution of the groundwater beneath their property.

19.

It was foreseeable that groundwater pollution would result from defendant's failure to abide by state statutes and regulations, and by defendant's failure to follow its own regulations governing water pollution.

20.

It is stipulated that the sites beneath the golf course on McChord Air Force Base are the source of the TCE pollution in the plaintiffs' wells, and that the iron buildup in Mary Clark's plumbing was due to pollution from those McChord sites.

21.

The plaintiffs have not established by a preponderance of the evidence that the defendant has committed the tort of trespass against the plaintiffs, because the plaintiffs have not shown the requisite intent.

22.

The tort of nuisance was not analyzed as a separate cause of action in this case because in order for nuisance to be actionable, the Federal Tort Claims Act requires a showing of negligence or wrongful act. Negligence has been analyzed separately and plaintiffs have not separately shown what otherwise amounts to such a wrongful act.

23.

The tort of negligence is a legitimate cause of action under 28 U.S.C. § 2680(a).

24.

When under local law the conduct of the wrong-doer would be regarded as negligence per se, the same rule is applicable to the United States as would be applicable to a private person. Such a stringent result may flow from violation of a statute or from other extreme wrong doing.

25.

Although Washington statute and administrative code provisions and defendant's own regulations established the appropriate standard of care, the plaintiffs had the burden of proving negligence.

26.

The plaintiffs have not met their burden of proving common law negligence. However, the plaintiffs have met their burden of showing that the defendant violated the relevant Washington statutes and regulations in Air Force manuals, that this violation was the proximate cause of the contamination of plaintiffs' well water, therefore that the defendant was negligent per se and that the defendant has not advanced sufficient justification for its acts for this court to excuse defendant's negligence.

27.

The plaintiffs have established by a preponderance of the evidence that the defendant had a duty to refrain from contaminating plaintiffs' property, that defendant's acts and omissions have violated the duty and proximately caused injury to the plaintiffs, thereby resulting in a finding, as a matter of law, that the defendant was negligent.

28.

The plaintiffs have established by a preponderance of the evidence that the acts and omissions of the defendant have proximately caused injury to the plaintiffs, by loss of rental income, diminution in plaintiffs' property values, loss of the use of quiet enjoyment of plaintiffs' property, the emotional distress and mental anguish of each plaintiff, and the costs associated with

the need to replumb residences to the Clark property due to iron buildup in the pipes.

29.

This litigation did not consider possible future medical conditions of Plaintiffs. Therefore, if any plaintiff develops a future medical condition involving physical injury proximately caused by his or her exposure to any contaminants disposed of at McChord, said plaintiff should not be prevented from suing defendant for damages resulting from the medical condition, and his or her claims are not barred by this action.

30.

Judgment shall be entered against the defendant as follows: $25,915.00 for the community of Edwin Nojd and Genevieve Nojd; $21,445.00 for Edwin Nojd; $30,-925.00 for Genevieve Nojd; $5,000.00 for Norma Crouse; $5,000.00 for Marta Vinnedge; $71,057.00 for Mary Clark; $6,825.00 for Janice Butler; $1,480.00 for Aaron Frank; $1,480.00 for Alan McCarthur; and $4,075.00 for John Gravatt.

APPENDIX

December 22, 1986

THE COURT: This is the time we set for an oral opinion in the liability phase of this case.

First, let me warn you, there are many days of work that have gone into this matter, not only in court time, but in preparing for this decision. It's going to take me quite a while to wander through this, so I hope you will be patient with me. I grew up in the judicial business under an old Code of Judicial Conduct that required that you give reasons for your rulings. That code is gone, but I still feel obligated to explain the reasons for my rulings and how I reach decisions. That, of course, is also necessary for the lawyers to be able to prepare the necessary papers. I have to make certain findings and conclusions and so forth. So when possible, I do that orally so as to move things along, but it is a long process, and I just want you to be patient as I go through this.

First, more for the benefit of the parties than the lawyers, but to some extent for the benefit of the lawyers as well, I would like to explain how these cases are decided. It's important, I think, for people to understand this because the public tends to think that judges often just rule on the basis of what they want to do and not on the basis of some other requirement or legal requirement. So let me tell you how this is done.

First, of course, evidence is produced in court and I must decide what the facts are based on a preponderance of the evidence and based on that evidence produced in court. A preponderance of the evidence is simply what is more probably true than not true. In doing that, I have to weigh the credibility of the witnesses and determine, based on everything presented, what is more probably true, and based on the probabilities, we come to conclusions, factual conclusions or findings of fact. Obviously, that is not an exact science and there is room for error in it, and sometimes facts are very close, or the evidence is very close on a particular fact, and one side or the other may win a point and a particular thing may become a fact in the case, even though the evidence on that particular issue was very close.

You should be aware that as part of that function, there is an important consideration in our system of law that we call the burden of proof, and on every point, one side or the other has the burden of proof. Basically, the burden is on the plaintiff to prove their case. Sometimes the burden shifts to the defendant. The importance of that is that if the evidence is evenly divided, then the one that has the burden of proof loses that particular point, and that can be a very important consideration.

So the first thing that the Court has to do in any case is to determine the facts, and that's how that's done. The second thing is to determine what law applies. This is done in many ways. The briefs of counsel are very helpful and get us into the law. My law clerk, Ms. Blanchard, has done considerable independent research on this, as have I, and that's part of the process. You saw the argument of counsel in

court, of course, which is part of the process of helping the Court with the law, and you also saw in this case something that there was more of than in many cases, and that is colloquy with counsel, where the lawyers and I are arguing back and— maybe not arguing—discussing back and forth the law and how it might apply. All those things are very helpful in educating me on the law and in helping me determine what the law is and how it should apply.

The third thing that comes in the decision making process is simply an application of the law to the facts, and the results flow from that application. If that is done honestly by the Court, then the chips fall where they may and it's not a process where the Court decides a result and then goes backwards to find a way to justify it. The facts and the law justify the result, and the result does not justify the facts and law. Now, there's some important reasons for that. One is, you have probably heard the phrase that our country is supposed to have a government of laws and not a government of men. If we have laws that are applied uniformly, it provides stability in society. If we have a situation where each case is decided by a judge based on what that judge happens to think or on that judge's abstract idea of justice, we end up with chaos. We should understand that law and its application have as an objective, or goal, justice, but we don't always appear to reach justice in our rulings in court. Maybe that is appropriate because injustices lead to changes in the law in order to improve the law, and we also have to remember that what may appear to be an injustice to one person may well appear to be justice to the other party. In other words, justice is not exact and we must adhere to the law regardless of our personal opinions of whether it's working right or not.

This process requires the judge to have some intellectual honesty or at least try to. It is entirely inappropriate, in my judgment, to have a favorite and then try to justify a decision based on who I think ought to win. I should not twist the law or the facts to reach a result, in other words. I think it's also better and easier on me if I try to determine the facts independent of the law and independently of the application of the law to the facts so that my personal feelings do not get in the way of an honest determination of what the facts are from the evidence.

All of that, I think, is important here because it would be easy in this kind of a case to simply conclude that since the defendant's wastes polluted the plaintiffs' water supply that the plaintiffs should then recover regardless of anything else and regardless of the law or how the law should apply. I cannot appropriately succumb to that sort of an approach.

Now, let me discuss for a minute this concept of sovereign immunity that we have been discussing throughout this case. It's something that is at the basis of this whole case, and it needs to be understood, I think, by anyone that is trying to understand what the Court does in a case under the Federal Tort Claims Act. The concept of sovereign immunity is ancient and it is based on the idea that you can't sue the king or the dictator or whoever else is the sovereign and in charge of governing a country. Ancient, however, is also the idea that that's not a good idea in a free society, not fair to the citizens, because sometimes the sovereign, be it a democracy or a kingdom or whatever, does things to people for which they should be allowed to have compensation.

So the idea of strict and absolute sovereign immunity is not very good law and not very just or fair, so in this country, our Congress decided that there should be some inroads made into that old idea. One of the results of their determination is the Federal Tort Claims Act under which we are in court. This is not a waiver of sovereign immunity; it is a limited waiver of sovereign immunity. What the Congress basically did is say, yes, citizens can sue the government in some limited ways, in recognized causes of action, but they cannot sue the government in what you might call novel or unprecedented theories and you can't sue the government if to do so would prevent in some way or inhibit the reasonable operation of the government.

So the result is the law that we have before us, with certain exceptions, and basically the law is that you can sue the government if the government commits a negligent or wrongful act. These are recognized causes of action and not novel or unprecedented. But the government will not go for a suit based on strict liability because, I suppose, the Congress looked on that kind of a claim as one that is in fact novel or unprecedented or would change substantially from state to state.

The Congress in its wisdom indicated that in suing the government, the government would adhere to state law, and state law would apply in claims against the government under this act. They made some specific exceptions, and those exceptions are important here. One is that you cannot successfully sue the government for statutory or regulatory functions done with due care, nor can you sue the government because you are unhappy with the way the government performed a discretionary function. The reason for those exceptions, of course, is because without these exceptions, the government would be inhibited from performing its necessary functions.

All of that law that I have just referred to is very basic to this case, and it may have sounded confusing in this simple statement of it, but believe me, it's a lot more confusing than that when you try to get to the details of it and apply it. But it is these changes to the ancient law of sovereign immunity that are the subject and focus of the legal analysis in this case.

I think next I should turn to the facts that have been established in this case and then try to apply those facts to the issues at hand. In doing this—I guess what I'm going to say is—the facts will be stated in a basically conclusory fashion rather than in great detail of each issue that has gone along.

Counsel, I neglected to do something before I start talking about the facts, and that is to file your deposition summaries and counter designations and objections and the original transcripts of the depositions of Hoffman, Sceva—where is that?— and Segal. Since these matters are in evidence, unlike the rest of the depositions that are not filed under our rules, I assume all these things should be filed as part of the file in this case. I neglected to do that before, but I've done it now.

The basic—or I don't know if you can call it basic. Well, I guess it is basic. A most important fact in this case is the stipulation reached by the parties before we started this trial. Without going into the details of it, the parties have stipulated that the contaminants at issue in the plaintiffs' domestic water supply originate from past disposal of wastes by the Department of Defense at McChord Air Force Base at sites underneath the present golf course, and further the stipulation refers to the nature of those contaminants. That obviously saved us a great deal of time and effort in this trial, and is a very important consideration.

Now, there are some other facts that we can fairly find from the evidence. One is that these contaminants, TCE, and for the sake of brevity, DCE, were known in the 1950's and '60s when these dumps were operated. They were not known to the extent that they are now known. They were not then known to be carcinogens, and in fact, based on the evidence, even though they may be classified in that way now, there is some substantial question about just how carcinogenic they are at this time. But it was known that they were not fit to drink and were in fact poisonous and were deleterious and should not be put in the water supply. That was general knowledge, I think, and the Air Force had that knowledge—or was charged with that knowledge along with everyone else. I should say that it wasn't just TCE and DCE that were known to be deleterious to a water supply, but a great many other things that we've heard about in this case: Aircraft fuels and oils, effluent from garbage. Oh, I could—you know, I can't think of other things—paint was one thing we heard about. There are a lot of things that are liquid or create liquids through the leaching process that all concerned knew should not be in the water supply from any sort of a dump or burn pit or anything of

the kind, and TCE was one of the things that people were aware of in general terms to be harmful to a water supply. We do know, however, that the measurements that we are now making were not available at the time that these waste sites were operating, and we do know that the extent and nature of the danger of these substances were not then known. So the knowledge of danger was a general one rather than a specific one.

In those days, also, we had a different view—"we" being everyone, I guess; in particular, the Air Force and those in charge of ground water matters—had a different view of the curative nature of ground water and a different view of the dangers of percolating leachates. Generally in the field there was not knowledge of how insidious these things could be, and knowledge has increased greatly in the last —well, in the years since 1950, and it's increasing at a greater rate all the time. Nevertheless, long before 1950, it was common knowledge that pollutants did percolate through the ground water; that there was a danger of pollution from percolating leachates, and that the ground water, if it was to be used for any purposes, including drinking, needed to be protected from any deleterious leachates. We know that we had these manuals, and we know that the manuals had the status of regulations so far as the Air Force was concerned.

I spent my time in the military and Army Reserve, and so forth, and I hoped I would never have to deal with military manuals and regulations again. They are difficult, sometimes, to follow. It's hard to figure out which ones apply and in which circumstances. But nevertheless, they are in evidence and they were available to the Air Force on the dates at issue. They set some standards and some requirements. In some areas that I will discuss, they leave wide discretion in the command. One thing is important in regard to the ground water references in these various manuals; that is, that while there is some discretion as to siting fills, dumps, and burn pits, and so forth, in relation to ground water, it is clear to me that it is a mandatory requirement in all the manuals that the presence

of ground water and the possible effect on ground water of any such activities must be considered.

It seems to me to be an obvious fact here that the effect of these sites on the golf course that ended up polluting the plaintiffs' water supply, that in regard to those sites, the ground water or the effects on the ground water was simply not considered at the time the dumps and burn pits were sited. You know, this is not terribly surprising, even though it was required by the manuals that at least the ground water and effect on the ground water be considered. My father had a garbage dump case that ended up in the Supreme Court of this state in 1952, *Harris v. Skirving and the City of Bremerton*, I believe it is, or maybe it's just *Harris v. Skirving* [41 Wash.2d 200, 248 P.2d 408]. He was successful in getting a permanent injunction against the garbage dump at Kitsap Lake in Bremerton. As far as I know, that injunction is still in effect for that piece of property. I read that opinion in connection with the research in this case and was a little bit surprised to find that ground water was not mentioned anyplace in that opinion. Of course, that siting was not governed by government manuals, but nevertheless, I guess it surprised me a little bit that ground water was not considered as an important factor in that siting. So, I guess what I'm saying is that we have a requirement in the manuals to consider the effect on ground water. At the same time, as we've heard from various experts, there was not much emphasis placed on the effect on ground water, and certainly in this case, it was not considered, based on the evidence before us.

Now, there's another factual matter that I think is important here in this connection, and that is that in all probability, based on the evidence in this case, a careful consideration or a reasonable consideration of the effect on ground water from the sites in the golf course would have resulted in either a different process on those sites or that the sites would not have been located there at all. We know from the geology and testimony about it that there were

particular ground water problems in that area that were not considered in the siting, and if they had been considered and been made known, the likelihood is that the Air Force would have done something to comply with the manuals, with the various manuals, in preventing pollution of the ground water.

Now, we know also that the dumps and burn pits here in issue on this golf course site—I guess it is referred to as site D on at least one of the maps—were at times operated pursuant to regulations as found in these various manuals and at times they were not operated pursuant to the requirements in those manuals. For example, there is evidence in the case from which we can conclude that the sanitary fill portions of the dumps were not always covered as required. We can conclude that there was standing water in the dump sites on occasion. You know, there was other testimony about a pond being there in one of these sites, but there is no testimony that that pond ever had anything dumped in it. I want to make that distinction, because there is other testimony that when ground water was run into, that before dumping they backfilled over the ground water, over the water table. But on occasion, there was standing water in the dump sites.

We know that there were fires on occasion in the dump that were apparently contrary to recommendations in the manual. That is, in the sanitary fill. We know that these dumps were operated as sanitary landfills, but also on occasion just as simply dumps that were not compacted and covered daily as sanitary landfills should be, but rather were more like trash dumps. We know that on occasion in the burn pits that have been discussed, while most of the time the fires were promptly started when liquid burnables were poured into those areas, we know that on some occasions the starting of the fires was delayed an hour or two. We know that the bottom of the burn pits, at least on, as I understand it—at least one pit was sealed or some attempt was made to seal the bottom, but also there were burn pits directly on the gravel. We know that there were barrels in the dumps on occasion with unknown contents. We know that some of the TCE that was placed in the bowsers that ended up in the burn pits was not separated or salvaged, as apparently some of the manuals, at least, indicate should be done.

So what we can conclude from this is that the dumps and the burn pits were not always operated strictly in accord with the manuals. That's not to say that they probably weren't operated in accord with the manuals most of the time. But certainly, they were not operated strictly according to the manuals.

The last finding is one that we have—well, a lot of this, obviously, is based on not only direct evidence, but circumstantial evidence, and it appears to me that the evidence indicates that if these dumps and burn pits had been operated strictly according to regulations, including the regulations regarding siting, that probably there would have been no TCE leachate come out, and no pollution resulting. There are some things that we don't know from the evidence, and these things can be perhaps just about as important as the things we do know. We don't know specifically where the pollution came from, only generally. That is, we know that it's from the golf course sites, but we don't know specifically where it came from, whether it came from the burn pits or sanitary fill or other dump or from all of those together. We don't know when it was deposited, and standards, of course, did change some throughout the '50s and '60s. We don't know how much was deposited. All we know is we have some estimate of how much is in the ground water now, but we have no way of knowing how much was deposited, whether it was hundreds or thousands or millions of gallons or whether it was no more than what was testified to by—now I can't remember his name.

MR. LORD: Todd?

MS. ESCHENBACH: Dr. Todd?

THE COURT: Yes, Dr. Todd. We don't know specifically who made decisions except in regard to siting, and that was the committee referred to. We don't know who actually made the deposits of this ma-

terial into these waste pits. That's not much in the way of findings in a case like this, but that's really about all we have because there are so many things that are unknown to us, so many details unknown.

Let me turn to legal theories and try to apply those facts to the legal theories.

The statute speaks of negligence, or wrongful act. Theories here are urged by plaintiffs sounding in trespass and nuisance. These theories, it seems to me, overlap a great deal with the negligence theory, and I'm not sure it's absolutely necessary to break them out separately. Basically, we consider trespass as the kind of an intentional tort that is not in existence here because there was no—the same kind of intent was not here that was present, for example, in the *ASARCO* case. What was done here was done without any of the same kind of intent, and I would not choose to call this a trespass, although, certainly, the Air Force is discharging things, pollutants, as far as we know, to this date from their property onto the plaintiffs' property. But that theory, it seems to me, does not apply for that reason. Nuisance as a separate theory, it seems to me, is not particularly important because in order for a theory of nuisance to apply, it must be coupled with a wrongful act or negligence, and if you have a wrongful act or negligence, it really doesn't matter if you call it a nuisance or something else. So as separate theories, those things are not particularly important.

That leaves the important issue of negligence.

Now, I have already discussed, in response to the defendant's motion to dismiss, the issue of pure common law negligence, and standing by itself, I indicated at the conclusion of the plaintiffs' case that the evidence was not sufficient to sustain an independent common law nuisance—or common law negligence action. We have more evidence now on that than we did at that time, it seems to me, and I'm not going to back off from that ruling, but at the same time, we have more evidence on negligence. In particular, I'm thinking of the testimony regarding the siting of these pits and that the ground water was not really a consideration, at least on the second of the three sites that were referred to. I think it's fair, probably, to extrapolate from that, that that was not considered at other times, either.

Similarly, along with the common law negligence as an independent theory, is the so-called res ipsa loquitur theory. That stands for, in Latin, "the thing speaks for itself," and arises under the facts when negligence cannot be proven, but an event would not have occurred without the existence of negligence. I think the common example is when a keg of nails falls out of a window at a construction site and hits somebody. It's not going to fall unless somebody up above was negligent in either putting it there or knocking it over or something. What it really amounts to, as a rule of law, is a way to satisfy the question of at what point has the plaintiff met its burden of proof, or how much circumstantial evidence is enough to carry a case forward? In this circumstance, it seems to me that res ipsa loquitur standing by itself is not a sufficient theory to get the plaintiffs past a challenge because, from the evidence we have heard, it is possible for the kind of harm that exists here to exist without acts of negligence on the part of the defendant.

Now, the third part of the negligence theory is a strict liability theory that would be based on the statutes that I'm going to discuss in a minute. The statutes of this state, under which the government is bound, along with the rest of us, can be read to impose strict liability on anyone who pollutes a well. I said earlier that the Eleventh Commandment in this state was that "Thou shalt not pollute thy neighbor's well." The statutes seem to indicate that that is a rule of law that is in fact a strict liability rule and that if you pollute someone's well, you are responsible for it regardless of your fault. The government won't buy strict liability under the Federal Tort Claims Act, so we cannot look at those statutes in that light and find that there is an absolute liability or strict liability sound-

ing in negligence, but based on a statutory violation.

That leaves the last issue here, which is under negligence, and that is the question of negligence per se that we have discussed at some length before in this case. Now, in coming to that issue, we find a whole new body of law and a whole bunch of issues and theories and ideas that become important. The idea, of course, of the rule is that when there is a statute, be it criminal or otherwise, that sets a standard of care, then a violation of that standard of care is, if you prove a violation, that's enough to prove negligence. But with a negligence per se theory, liability does not necessarily follow a statutory violation unless there is in fact fault underlying the violation.

We have a lot of cases on this. The way the pattern jury instructions read is probably the best, or probably as good a statement as any, and in Pattern Instruction 60.01—I'm talking about state law now, of course—the rule is stated as follows:

"The violation of ... a statute or regulation is negligence as a matter of law. Such negligence has the same effect as any other act of negligence.

"While the violation of a statute or regulation is, generally speaking, negligence as a matter of law, such a violation is not negligence if it is due to some cause beyond the violator's control, and which ordinary care could not have guarded against."

Of course, in order for negligence, be it negligence per se under this rule or any other kind of negligence, in order for it to be actionable, it must have been a proximate cause of the harm complained of. This rule of law helps us to set a standard of care, and a standard of care is at the basis of any negligence issue. In other words, what is the duty that is violated, if there is a duty?

In this particular case, in coming to the question of what the government's duty is and what it was at the time that these dumps were sited and operated, there are a number of things to consider. First, as is indicated by the rule of law I just read, the government, like everyone else, has the duty to follow state statutes. That sets the standard of care, if they have been adopted, and I will refer specifically to those statutes in a minute. The government also has the duty to follow Administrative Code regulations of the state, and they also have the duty to follow their own regulations; that is, their own manuals.

As part of this duty equation, in order to figure out what someone's duty is, the issue of foreseeability comes into play, and we have discussed that some, and just how specific a result has to be foreseen before it is forseeable under the law. In this particular case, in regard to foreseeability, I think that the foreseeability that the statutes talk about and that we should reasonably adopt here is a general rule of foreseeability. That is, is there a danger that an act will pollute someone's ground water, and not a specific foreseeability? That is, if I put this particular substance here, will it result in a risk of cancer 25 years down the road to someone that drinks a certain amount of water? In other words, I think it's a general rule of foreseeability. That foreseeability rule is part of the standard of care that is set out in our state statutes.

Let me refer to those statutes particularly. One that is probably the least applicable, if it applies at all, is RCW 70.54.010, a 1909 statute that provides that "Every person who shall deposit or suffer to be deposited in any spring, well, stream, river or lake, the water of which is or may be used for drinking purposes ... any matter or thing whatever, dangerous or deleterious to health, or any matter or thing which may or could pollute the waters of such spring, well, stream, river, lake or water system, shall be guilty of a gross misdemeanor." I left some out that is not particularly important.

That statute probably applies to surface waters or direct pollution of a well rather than to ground waters. Nevertheless, it's a pretty clear indication of the public policy of this state and the standards of this state in regard to waters generally, and in particular with regard to the ground water statutes that appear elsewhere. And the first

of those—I don't know the date it was passed, but it was an old statute—is the nuisance statute, RCW 7.48.140, and in particular, subsection (2), that declares it to be a public nuisance to "in any manner to corrupt or render unwholesome or impure the water of any such spring, stream, pond, lake, or well, to the injury or prejudice of others."

Those two statutes have very strong language, and clearly, together with the third statute I will refer to in a minute, indicate not only the public policy of the state to place the burden on the polluter rather than the pollutee, but also, pretty clearly indicate the standard of care that we all have and the care that we are all obligated to give to whatever we do that might affect someone else's water supply.

The most important statute, however, is RCW 90.48. This statute we have discussed before, but it recites in section .010 that it is the public policy of the state to maintain the highest possible standards to insure the purity of all waters, and requires the use—in the policy statement— requires "the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the State of Washington." The government here argues that they did use all known available and reasonable methods to prevent the pollution of waters, but as I have already indicated, that is really not the case. They didn't use all known available and reasonable methods based on the facts that I have already provided, or that I have already made findings on. The most obvious things they did not do, of course, is to use reasonable care in where they sited these things. That originally was a 1945 statute.

Section .020 indicates that "person" includes government agencies and any entities, and makes it clear that "waters of the state" includes ground water, underground water, and broadly interprets the word "pollution" as contamination or other alteration of the physical, chemical, or biological properties, of any waters of the state, and includes the discharge of any substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate benefical uses.

So this statute applies to this particular pollution problem, and the key part of the statute provides that it's unlawful, and that language in this state makes it a crime. So this is not only a criminal statute, but also sets the standard of care. It's "unlawful for any person to throw, drain, run, or otherwise discharge into any of the waters of this state, or to cause, permit or suffer to be thrown, run, drained, allowed to seep"—allowed to seep, that's important, I think—"or otherwise discharged into such waters any organic or inorganic matter that shall cause or tend to cause pollution of such waters according to the determination of the commission." As we know from the research done by plaintiffs' counsel, the commission did make some determinations some time ago. An important thing about these statutes is that they speak to the future. They are not just speaking to the past or the present, but they speak to the future. For example, the one I just read, "shall cause or tend to cause pollution."

Now, the commission is spoken of in that statute. They did define, make some definitions regarding water quality, I believe in 1960, and in adopting those standards indicated there should be no industrial waste discharged in any waters of the state that would cause toxic conditions deleterious to fishes and related forms or affect the potability of drinking water, or the formation of organic or inorganic deposits detrimental to fishes and related forms—I know the plaintiffs aren't fishes—or be injurious to health, recreation or industry. Rather broad standards, but nevertheless, the standards in effect as of 1960. They also adopted standards for the disposal of waste oils, and we know that at least in part, the TCE here was disposed of along with waste —petroleum, oil, and lubricant products—in these so-called bowsers. The Administrative Code goes on to say that the location of disposal points for oil shall be such as to

eliminate any possible pollution of either surface or underground waters.

Now, taken together, those statutes and Administrative Code regulations provide a standard of conduct for the government as well as for the rest of the citizens. In addition to that, the manuals, as we know from the testimony, have the force of regulations and provide standards. I'm not going to go through all of these things, but there are some specific standards that are important, and we considered these things in connection with ground water, particularly. Exhibit 21 uses the word "should" in connection with "should not"—I don't have the quote. That manual spoke to sanitary fills and indicated they should not be sited in a way that would pollute ground water. Exhibit 22, having to do with industrial wastes, has the stated objective not to pollute the ground water and had warnings in it about polluting the ground water. Exhibit 23 indicated that that has to do with refuse, collection, and disposal. That indicated that ultimate disposal must not contribute to a public nuisance, and we know in this state, at least, a public nuisance includes water pollution. 24 was silent on this subject. Exhibit 46, which is the oldest of the manuals, October of 1946, had language—and I think this is a quote, although I didn't put quotes around my notes, so maybe it isn't exact—said "Do not select sanitary landfill sites which have subsurface drainage to the water supply." That manual did provide that it could be in high water table area—that is, sanitary landfills could be in high water table area, but that, of course, was subject to the limitation on no subsurface drainage to the water supply. And Exhibit 88 had, as a stated objective, to not pollute the water supplies or underground water.

The point of that review is that along with the statutes of the State of Washington and regulations, which the government by its regulations indicated should be followed, the government itself had as a mandatory obligation in its various manuals to at least consider the effect on ground water of sanitary fills and industrial wastes, burn sites, or disposal sites, and at least one, the oldest one, had a mandatory requirement that landfill sites not be located where there was subsurface drainage to the water supply. You add all of that together, and what you have is a pure, I think, and clear statement making the standard of care one that is very much akin to the Eleventh Commandment that I referred to. The burden is on the polluter.

Now, in order, however, for that standard to be properly applied in this circumstance, it cannot be a strict liability standard. Even though it might be a strict liability for the rest of us, it is not a strict liability standard for the government, but it, nevertheless, does set a standard of care. But the government has the out, if you will, the escape hatch, that even if there was a statutory violation of this standard of care, that it would not be negligence if it was due to some cause beyond the violators' control and against which ordinary care could not have guarded.

There was filed late today a brief from the plaintiffs, and a responding brief from the defendant regarding shifting of the burden of proof, and I should discuss that somewhat.

We're going along here. I've only been talking about an hour. I talked for three hours and fifteen minutes one time, but it won't be that long.

What the plaintiffs basically have urged in their brief is that upon a showing of negligence per se, the burden of proof then shifts to the government, and there is some indication that that may be the correct rule, but in my judgment, the State of Washington has not gone that far yet to make a pure shifting of the burden. The cases speak of going forward with the evidence, which is different than shifting the burden of proof, and the burden of proof in this case, in my judgment, is very important because of the things that I referred to earlier that we don't know about. The effect of negligence per se; or, that is, the effect of a statutory violation here by the government is not that they are therefore liable, but that they can be found liable on that basis, if the Court is satisfied from the evidence, not only that the statute was

violated, but in fact that there was fault in the statutory violation. In regard to that issue, it seems to me that not only was there a statutory violation here, but based on the acts and omissions of the Air Force, there was also a showing that the Air Force was at fault. I have made the findings of fact that support that, that are separate from a showing of a statutory violation.

There's a Ninth Circuit case that talks, I think, about Washington law and a relationship of common law negligence and negligence per se, and in this case, it is Judge Belloni from Oregon discussing the Washington case of *Wood v. Chicago, Minneapolis [Milwaukee], St. Paul and Pacific Rail Company*, 45 Wash.2d 601 [277 P.2d 345 (1954)]. The case is *United States v. Burlington Northern*, in 500 F.2d 637. A 1974 case, but I think probably still good law. He indicated as follows:

> "We," meaning the Ninth Circuit. "We do not read *Wood* to impose on plaintiffs the burden of proving common law negligence in addition to proving a violation of a statute. Such a reading would go far to 'emasculate' the negligence per se doctrine. Rather, *Wood* stands for the proposition that when a prima facie case of negligence liability for violation of a statute has been made out, the defendant has an opportunity to explain the violation and to present an excuse in order to show that the violation occurred without negligence."

That is, they can then offer proof of justification or excuse, or in the language of the pattern jury instructions, that the violation was beyond the violator's control and ordinary care could not have guarded against it. That does not shift, in my judgment, at least, the burden of proof to the defendants. The burden is still on the plaintiffs to prove by a preponderance of the evidence that there was negligence based on the acts of the defendant and the statutes. Once, however, the trier of fact is convinced that the plaintiffs have made out their case, then at that point you might say that while the cases only clearly speak to the opportunity of the defendants to go forward, that what it really means at that

point is that they have the burden of proof to turn the trier of fact around. But there are no cases in this state that I know of that have gone so far as to clearly find that the burden is shifted. The *Hyatt v. Sellen* case cited by plaintiffs speaks to giving the defendants a reasonable opportunity to show due diligence. That's another way of saying that they have an opportunity to go forward with the evidence to counter the showing of negligence per se.

As I indicated, the burden of proof issue can be very important, and in this case it has some importance because of the things we don't know about, but let's talk in this connection about the defendant's proof. They did not prove that these burn pits and dump sites were—that the sites were chosen with due consideration of ground water issues. In fact, they did not show that there was any consideration given to the ground water in siting these waste disposal sites. They did show that most of the time these sites were operated, basically, in accord with the regulations, but were not able to offer evidence that they were always so operated or that there was any control, except very informal control over such things as when or how much TCE was dumped, at either the sanitary landfills or the other dumps or the burn pits, or when the fires were started. The controls were not tight. They were not able to offer as testimony exactly where this stuff came from, nor when it was deposited or how much was deposited or who made the decisions about what to deposit in the landfill or burn pits or in fact who actually deposited it. So the open issues that were open at the conclusion of the plaintiffs' evidence are still open.

We don't know a lot of things about this, and if the plaintiffs' proof is sufficient on the basic issue of negligence, based on negligence per se and the other acts referred to of the defendants, then it's up to the plaintiffs to come forward to change the trier of fact's mind, if you will—or up to the defendants to come forward to change the trier of fact's mind or to offer evidence of excuse or justification. The evidence offered is basically that "We

didn't know this was going to pollute the ground water when it was done." It seems to me that that is not sufficient excuse or justification, because of the findings earlier made, that they knew or should have known that it could well pollute the ground water and that there was danger to the ground water in the place these dumps were placed and in the way that they were operated, and in particular, in what went in them.

Now, that does not end this inquiry because in order for liability to attach, even though all of the elements of negligence based on these statutory and manual violations is present, and it is pretty clear that those violations have caused the harm here complained of, we must determine whether the discretionary function exception applies.

One thing I didn't make a note of and I should comment on briefly, and that is the reasonableness of the fears that we discussed earlier, and I don't want to go into that in any depth, except that it has clearly been shown by the plaintiffs' evidence that there was reasonable grounds for the plaintiffs to be afraid and concerned—and I don't have the specific language in front of me that I should probably refer to—but it seems to me they made out a case that a reasonable person would suffer fears and concerns based on this pollution. Fears and concerns for personal health and health of family.

Now, let's talk about this discretionary function. This is perhaps the most complicated and difficult area in this whole case. We have a number of cases that have discussed this, and they have gone all over the map. Jayson, the treatise—where did I put that?—has indicated that—if I can find the quotation here. He calls it the provision of the Federal Tort Claims Act that is probably the most difficult to understand or to apply. He suggests that it's—well, that's something else. He suggests that it has never really been defined—that is, discretionary function has never really been defined—and that the Supreme Court has even said that it may be impossible to de-

fine it. So now I have to try and define it, I guess.

One of our more recent cases indicated that we should look to the nature of the conduct, not the status of the actor, in determining whether it was a discretionary function. At one point the Ninth Circuit went on a distinction of planning or policy decisions being discretionary while operations decisions were not discretionary. And there's other law to the effect that the planning or policy decisions that are discretionary are social, economic, or political policy. Those distinctions are not really very different, and I think the distinction between planning and operations is still a matter that the Court needs to consider, although it's not dispositive. That ties in with what the nature of the conduct was. There's just all kinds of law. One refers to policy judgments and decisions equaling discretion. Another is that an employee acting in accord with official directions is acting with discretion. One of the cases spoke to the discretionary function being acts of the nature and quality that Congress intended to shield. Well, it's pretty hard to sit here and try to figure out what Congress meant by some act. One thing we have seen—and Alice, in particular, picked up in her review of these cases—is that it appears that the courts are more likely to find liability when all of the control of a particular event is in the hands of the government as opposed, for example, through a government inspection of private industry. Of course, in this case we have all government control. But that's a trend rather than a rule.

There's some other comments in Jayson that I felt were very helpful in this analysis, and it all ties together, it seems to me. He suggests that it's helpful in determining whether the exception would apply to ask how the claim would fare if the defendants were a public official or a municipal government which can be sued, or if the relief sought is mandamus. I think we know what happens to local governments, for example, in garbage dump cases. They are certainly held to account.

Let's see, there are some other thing here that tie into this.

Well, some other ways of looking at this involves a weighing of policy alternatives or balancing of competing public interest factors. Then it's discretion. If the decision involves an evaluation of factors such as financial, political, economic or social considerations, then it is discretionary. If a government official must act without reliance on a fixed or readily ascertainable standard, his action is probably protected by the exception; but, if there is an objective standard by which his conduct is readily measurable, it is not.

Those are some of Jayson's evaluations again.

He also says that most decisions relating to the administration of federal property— that is, when and where buildings should be built, what property should be acquired or sold, and the uses to which they are put—falls into the discretionary area covered by the discretionary function exception.

And some other generalizations, as I kind of zero in on this from all of these other things: The discretionary function exception will probably apply when the claim arises out of the government's decision to undertake a works project or governmental program. When the claim arises out of the execution of the public works project or governmental program, and if the design or plan itself dictates the specifications, schedules, or details, when carefully adhered to, give rise to the claim, the discretionary function may apply. But if there is a wrongful deviation from or negligence in carrying out, the design, specifications, schedules, or other details of an operation set forth in the overall plan, the discretionary function exception is not applicable. If the overall plan is only general in terms and silent as to detail, there is a conflict of views as to whether the discretionary function exception applies to a negligently conceived mode of execution. If the claim arises out of negligence in connection with the day-to-day operation and maintenance of the public works or program, the discretionary function is not applicable. And again, the discretionary

function concept that while a governing body is immune from a damage suit from the undertaking and the design of a public works project, it is not immune if there is negligence in the execution. The exception does not apply to a claim that government employees failed to apply with a policy or guide.

Those are a bunch of generalizations from various sources—Jayson in particular, and various cases. The reason I refer to all of those various things is because it seems to me, in light of the case law at this time, that I have to look at all of those things and try to put them together in order to decide what in this case may be a discretionary function and what may not.

That leads me to this conclusion in regard to discretionary function:

It seems to me—well, let me say one other thing now before I get to that. It's interesting to note—and I did some looking at this. It's interesting to note that this discretionary function exception goes to jurisdiction. That is, if what went on here was a discretionary Air Force function, I don't even have jurisdiction to decide this case. It's just out. It's not a defense that is raised by the government so much as it is an attack on jurisdiction. Some courts have tried to make it into a defense, but that's not what it is. It is really the plaintiffs' burden from the beginning to prove that it is not a discretionary function in order for the Court to have jurisdiction at all. We considered this in a summary judgment motion in advance of trial, and I ruled that I had to know more about the facts of the case before I could decide whether it was a discretionary function or not, and I think that's appropriate, because as you have seen from my rather lengthy discussion of what at least one writer in the various courts have said about this exception, it does depend on what the facts were in order to determine whether it applies.

Now, here is where I come down on the discretionary function. It seems to me, in general terms, that the siting of a garbage dump is a discretionary function. However, it further seems to me that when there are specific requirements as to siting,

that if those requirements are not met, then that function is no longer discretionary. In this case, in particular, while generally the siting of a garbage dump at McChord Air Base is a discretionary function, there was a positive, regulatory requirement at all times throughout this, the time that these dumps were sited and operated, that they be sited with at least, at minimum, a consideration of the effect on the ground water. The evidence in this case is silent in regard to whether that was ever done. The only evidence is that at least on the second site that it was not done. That gives rise to an actionable claim of negligence, and it gives rise to jurisdiction.

The other things that were done here in regard to the operation of the dump—and again, the findings I have referred to have talked about this. These various things, it seems to me, are clearly outside of the discretionary function. The operation of the dump was operational in nature, it didn't involve any policy or social planning. It was the kind of decision that was governed substantially by the regulations at hand, and in addition to that, by the statutes of the State of Washington and its Administrative Code requirements, and there was no discretion on the part of the operators at the dumps and burn pits at McChord to operate them in a way that would allow the pollution to occur that did occur in this case.

Based on that analysis, it is my judgment that the defendants in fact are liable for the damages that the plaintiffs can prove to have been caused by this particular pollution in the ground water.

I apologize for the length of these remarks. I may have left some things out that need to be addressed, and I will do so if you call those things to my attention. I could go into a great deal more detail than I have done, and you may want to do that in findings, but I hopefully have covered the reasons for my rulings, the analysis and the facts upon which it's based.

I assume that we will start tomorrow morning, and get at least one day in before Christmas? So we will reconvene at 8:30 in the morning for that purpose.

(Court recessed at 2:30 p.m.)

December 23, 1986

THE COURT: Before we start this morning, I want to make a short supplement to the remarks I made yesterday. Ms. Blanchard was concerned, and I think she's right, that I may not have explained my view of the discretionary function exception adequately or may have left the wrong impression.

In a general way, it is my judgment that the determination to have a garbage dump and the planning of it are discretionary functions. However, there is a limit on that provided in the various manuals that are in evidence in this case. Those manuals dictate some specifications or design requirements. If those requirements are followed, the discretionary function exclusion would be applicable. If they are not followed, in that respect, there is no discretion, and there would then be a wrongful deviation from the requirements. In this case, if you want to have a garbage dump or other waste disposal site on an air base, the decision to have it and where to put it, while generally a discretionary function, must be done specifically in accord with the manuals. There is no discretion in following the terms and conditions and requirements for the plans and so forth in the manuals. There is a specific requirement that involves no discretion that the ground water impact be considered. That was not done, and that took that portion of the siting of the waste disposal facilities outside the discretionary function.

In other words, it's my view that a function can be discretionary in many parts, but not discretionary in some details that are required details. In this case, if you are going to plan a garbage dump, it is required that the government consider ground water, and that portion of the planning or siting is not discretionary at all, and it is not protected by the discretionary function exclusion. If the Air Force had taken into consideration the impact on ground water and made a mistake about it, you might have a different answer. But

they had no choice in whether they should consider that particular issue based on their own design requirements found in the manuals and the limitations on their functions found in the manuals.

I hope that explains that a little bit better than perhaps I explained it yesterday, because what I am saying is that the fact that something may in some general ways be discretionary, doesn't mean that in all of its parts and details it is then discretionary.

January 7, 1987

THE COURT: Good morning.

The fixing of damages is one of the most difficult tasks that judges have in the nonspecial damage areas. There is, of course, an immense amount of discretion involved, and it just simply is difficult. It's much easier, perhaps, for a jury where you have twelve people that can sit around and kick numbers around, and so forth, and come to some conclusion.

The law on damages is general in those areas, and basically the task of the Court is to determine—and I'm referring to our state pattern instruction book—but it is to determine the amount of money that will reasonably and fairly compensate the plaintiffs for such damages as were proximately caused by the negligence of the defendant. That issue of what's reasonable and fair is the kind of thing that what one person thinks is fair another person doesn't. It ends up with what I think is reasonable and fair based on the evidence presented.

I spoke to you at the end of the liability phase regarding the burden of proof, and we have to bear in mind that the burden of proving damages rests with the plaintiffs, and I have to determine whether any particular element of damages has been proved by a preponderance of the evidence. That burden does not shift to the defendants.

With that preface, I will dive into this. I spent considerable time yesterday working on this, and I have notes that are voluminous, and I hope my notes make sense to me today. They did yesterday.

I guess I should tell you how I will proceed. Again, as I indicated before, I have to tell you how I came to my conclu-

sions and the legal underpinnings for these conclusions, so it will take some time, but I will try to move right along with it and not cover everything. In that regard, in preparing findings, it is not my intent in an oral opinion to state everything that should go in the findings, and you will need to flesh some of these things out.

The way that I have structured this is to discuss on each element, first, the Nojd plaintiffs, and then the Clark plaintiffs, if we can lump that in that way, and will go through this first in regard to rentals and then damages to real estate, the other special damages claimed by Ms. Clark, and then the physical injuries, inconvenience, and emotional distress claims in that order.

So first as to rental loss. The Nojds—and I guess some of this is community damages, and perhaps other is separate. I haven't tried to resolve that. I assume counsel can.

It's agreed that the Nojd rental loss was in the sum of $915, and I would so find.

It's not such an easy task to determine the loss to Ms. Clark in her rentals. The testimony on this was somewhat confusing to me, and I found it difficult to reconcile all of the testimony to try and come to a hard number. Mr. Eaton's figures indicated a minimal loss, basically ten percent times three rentals, coming to about $60 a month times 41 months, equals $2460. That is not an unreasonable approach. On the other hand, it was not particularly convincing to me that that was the total loss. The tax returns that are in evidence indicate that—well, they are equivocal, at best, and indicate that we don't have a real clear financial showing by books and records of just exactly what these losses were.

Damages here should be fixed without reference, I think, to the tenants' inconvenience, that being a separate item of damage claimed. We're only talking about rental loss. There is a substantial question in my mind as to whether Ms. Clark acted reasonably in trying to mitigate any loss. She did not continue to make effort to rent the properties and to make repairs on them to keep them tenantable. There is evidence that is believable that if that effort had

been made, these properties would have been more likely to have been rented on the general market. Certainly, the loss was not as total as claimed because Mr. Gravatt stayed there; Ms. Butler moved in with her family. So there was not a total loss based on the water problems.

I guess what I am saying is that the claim of what amounts to basically a total loss of rental value that Mr. Raaen argued is really not borne out in my judgment by the evidence. It seems to me that Mr. Eaton's figures were about half right, is where I come to on the end of this. That it would be fair to fix the loss at about 20 percent of the three units, which would amount to $120 a month for approximately 41 months, or $4,920. Based on all the evidence and the problems that I have just referred to, the fact that the rentals did fall off, but it's hard to pinpoint exactly the reason for that under all the circumstances, I'm satisfied that Ms. Clark has made out that much of a rental loss, but I'm not satisfied that she has made out any more than that. I would fix that rental loss at the amount of $4920.

Now, in regard to diminution of the real estate values: I probably tipped you off a little bit about what I felt about the appraisers' opinions in a question I had yesterday. You know, you take judges as you find them, and I have had a lot of experience with real estate appraisers over the years. I have heard, I suppose, hundreds of them testify in court now. The two appraisers were well qualified and good appraisers. I did not believe that either of them came to a perfect conclusion. There were lots of problems with their appraisals. For example, in regard to this Lung sale that is right in the area, that both of them used as a comparable, the way each appraiser approached that sale shows how subjective the appraisal business is because they each looked at that sale, they each came to conclusions from it, and each looked at it from a different direction with different information and came to different conclusions. Mr. Rice did not see the broker or the buyer; Mr. Eaton did not see the seller. It seems to me that Mr. Rice put too much emphasis on the Lung sale and

his view of it, and he was probably five percent off in regard to the mobile home that was part of that deal, and it seems to me Mr. Eaton put too much emphasis on that sale and his view of it was probably not accurate. That doesn't mean I should discount that sale as a comparable entirely, but it leaves me with the question in my mind as to just how important it is here. I am inclined to think that it did not go at full market value, as Mr. Rice indicated, but I'm not sure just how far off market value it would be fair to review that as a comparable sale. In order to get an accurate picture of that, I suppose we should have both appraisers—I mean, the best way to do it would be to have both appraisers finish the analysis to that sale and come back with new opinions.

But anyway, I think they both made an error in that regard. Mr. Rice, I believe, made a substantial math error—or maybe it didn't start out with a math error, but turned out to be that on the garage inclusion; included too many square feet. I think Mr. Rice assumed the worst going in, and I think that may have colored his opinion to some extent, and he had sort of an opinion that the ground was poison and was just a real bad situation, and his opinion was based not on the hard facts, but more on the kind of public opinion or media information that has been floating around in this case.

Mr. Eaton, I talked about his emphasis on the Lung sale based on less than full information. I think he made an error in trying to use just trends in the American Lake Gardens area rather than a larger area. I think his view was too narrow and that his view of comparable sales was too narrow and his independent study, which resulted in some three sales in American Lake Gardens, as I recall, was really too narrow a study. In addition to those things, each appraiser made comments about the other appraisal, where they thought the other appraisal was weak, and I guess I believed—both appraisers, I believed them when they were talking about the weaknesses in the other appraisal.

Now, I don't want to be too critical about this because both appraisers are well qualified and went about their appraisals in a workman-like appraisal fashion and they came to different conclusions, and their different conclusions simply show how subjective the appraisal business is and how important the opinions of the appraisers are.

I might say one other thing about the Eaton appraisal. He lost some credibility with the Court when he testified that he believed there was no chilling effect whatsoever from this situation there at American Lake Gardens. I just found that not believable. You know, he said, as I recall, that he thought going in that there would be some chilling effect but the numbers did not support that, the comparable sales and so forth. I think he should have followed his original hunch, because it is inconceivable to me that there would not be some chilling effect on knowledgeable buyers from the events that have occurred there at American Lake Gardens. If you had two identical pieces of property, one of which had this problem of underground water contamination, one did not have it, any knowledgeable buyer that was looking for a piece of property like that would buy the one that didn't have this problem, or if they wanted to buy the one that had the problem, would discount the price to some extent. That seems to me to be common sense based upon my experience with real estate over the years, I guess, and based upon the evidence in this case.

Okay. That's some discussion of those appraisers. Of course, where it leaves me is in using the information they brought and my judgment and all of the rest of the evidence in the case to try and come to some conclusion as to what diminution in value there has been as a result of this contamination.

In that regard, there are a couple of other preliminary things that I should comment on. One is that the testimony here, the more believable testimony, has been that the Lakewood Water hookup has not conferred any special benefit on these properties over and above what they had before, assuming the wells were not contaminated. In other words, there is some benefit from that hookup that people served by wells don't have. On the other hand, there's some benefits from wells that Lakewood Water doesn't have, and those things apparently balance each other off.

Also, there is an argument here made by the government that this is only a temporary damage and should be viewed as such. It appears to me, based on the evidence in this case, that this is a permanent damage item that we are discussing. It may end some day, but we don't know that it will, and we don't know when, if it will. We don't know what the government is going to do further about this, although they have some plan to do something more, I guess, at least to study the problem more to see what can be done. But as of this time when it comes into court, so far as we can see, based on the evidence in the case, this is going to be an ongoing problem off into the future with no end in sight. And it seems to me, based on that, that the correct measure of damages is based on diminution.

I am mindful that Ms. Clark has more property and that apparently the values placed on the Nojd improvements are greater than that on the Clark improvements. I did not attempt to divide out land from improvements based on the testimony that the probabilities are that we aren't going to have any substantial changes in the land use out there in the foreseeable future, and that we are really looking at a continued use similar to the current uses, which means to me that the total value of land and improvements is the correct thing to consider.

Based on all of those things, it is my conclusion that the—wait a minute, I've got to find my proper notes here. That at this time the Nojd property—there are a lot of ways to put this, but let me put it this way: That the Nojd property, if it did not have this contamination and the ground water problem, would have a value of some $200,-000; and the Clark property, some $215,-000. It appears appropriate to me, based on the evidence in this case, to reduce those

values by twelve and a half percent for the ground water contamination problem, which translates out to a damage figure for Mr. and Mrs. Nojd of $25,000 and for Ms. Clark of $26,875. Those figures are based, as I have indicated, on compromises and various computations back and forth using the information provided by the appraisers and the other witnesses in this case and applying my own judgment to for those numbers.

The next item of damage is Ms. Clark's claim for some $7500 for plumbing repairs or replacement. We have a proximate cause question here, and the damage amount is really not in question. Mr. Althuser's testimony seemed reasonable that to make the appropriate replumbing repairs to fix the damage, $7500 is the appropriate amount.

I want to refer from time to time here, perhaps, to the proximate cause rule, and it is a difficult rule to apply because, like other damage rules, it is somewhat general, but the proximate cause is a cause which in a direct sequence, unbroken by any new independent cause, produces the injury complained of, and without which such injury would not have happened. There may be one or more proximate causes of an injury.

Based primarily on the stipulation reached in this case, it appears to me that the problem, the iron problem in Mrs. Clark's plumbing had as a proximate cause the contamination from the McChord Air Base dumps. That conclusion is based more on the stipulation reached by the parties than any other single bit of evidence. There may well be other causes, but we don't know for sure what they are. It may be because of the high water table or shallowness of the well, or whatever, and other things. But what we do know and what I conclude from all of the evidence is that a proximate cause of this iron damage to her plumbing was the contamination from McChord. Therefore, she is entitled to recover the cost of cure, if you will, of $7,500.

In addition, Ms. Clark claims some $92 for the cost of water that she purchased from commercial sources after she was directed not to use her well, and she should recover that $92 item.

Now, Ms. Clark and Ms. Butler both claim personal injuries caused by accidents that occurred while they were carrying these heavy 50–pound-plus water bottles provided by the Air Force. Again, I tipped you off to this issue, I guess, by a question we had or discussion we had earlier in the case, but this is another proximate cause question. To make a long story short, it appears to me that the causative relationship has simply not been made out here. The contamination problem that is at the heart of this case did not cause these injuries in a direct sequence unbroken by any new, independent cause. The Air Force's determination to provide bottled water was not something they did as a matter of requirement. You know, there was no court that directed them to do it, it was a voluntary choice on their part. How Ms. Clark and Ms. Butler chose to handle that water after it was delivered was their choice. It just seems to me that from the siting and dumping problem that brought us into court, there is a leap that can not be made into these personal injuries. That stretches the causative thread to the breaking point. So it's my judgment that neither Ms. Clark nor Ms. Butler should recover for any physical injuries that may have occurred as a result of handling this bottled water.

That brings us to the inconvenience factor. This is one of those very difficult areas that just is—well, I don't need to say more about that, but it is a difficult area for a court to bring some determination to. All concerned that lived in American Lake Gardens during the time up until the Lakewood Water was hooked up suffered some inconvenience; some more than others, and it was a more serious inconvenience to some than to others, I expect. It's really difficult to measure and to put into dollar figures just what is fair and reasonable for that kind of inconvenience. Probably it was worse to begin with than it was after they got used to the fact that they had to bring in water. It was worse before the government started supplying bottled wa-

ter than it was after. It was worse for people that were there full time than it was for people like Mr. Gravatt who is gone to work every day. It was worse for people with children than it was for people who did not have small children in their house. But those things all are very difficult to quantify or to put dollar figures on. I have approached this in a fairly arbitrary way and have tried to treat individuals individually, but also have tried to adopt some sort of a standard to apply across the board and then work from that one way or another.

So let's first talk about Mr. and Mrs. Nojd.

Mr. Nojd, it seems to me, is entitled to some compensation for his year of getting water from off the property and bringing it in. He testified that for about a year—that is, of course, 52 weeks—that either once or twice a week, depending on the season, he spent between an hour and a half and an hour on a water errand. Now, I guess I translated that into five dollars an hour, which is not what he's worth as a school teacher, but you can get labor for five dollars an hour for odd jobs, and so that's the figure that I used. Arbitrarily, to come to some number, I assumed two times a week for 52 weeks, but only assumed an hour trip, which translates out to 104 hours. Another way to look at that same figure would be ten dollars a week for one and a half to two hours of work either once or twice a week, but to consider it ten dollars a week. So I allowed $520 for those special efforts.

Now, in addition to that, he had, along with Mrs. Nojd and Ms. Clark, particularly, the daily, all day, every day problem of living with the inconvenience of not having pure tap water. Counsel has urged various figures on me. I arbitrarily set that figure at what appears to me to be a reasonable number, bearing in mind, as I said, that the problem was worse at some times than it was at others, and I turned that into a five dollar a day per person figure.

Now, counsel, somewhere here I got the figures that the Nojds were inconvenienced for a less period of time than the Clark

defendants, or that there was a difference in days or weeks or months or something. That was not very clear to me, but I don't think it's terribly important. It's pretty close in the numbers. But in any event, for Mr. Nojd, that figure came to $5,925. You add that to the $520 for delivery services, if you will, and that totals $6,445 for—well, we've been talking about inconvenience, and that's, I guess, a term to use, for the fact of being without water from the pure tap water.

Mrs. Nojd, I did not allow anything for the water delivery, but the same amount for inconvenience of $5,925.

For Ms. Clark, I arbitrarily allowed an amount equal to Mr. Nojd of $520 for the work she had to do to get water at the stores and neighbors, and so forth, before the hookup to Lakewood, and it's my understanding that she was without water for proximately 1230 days. I'm not sure why that difference came in, but that's what the evidence seemed to show.

MS. ESCHENBACH: Her wells were tested a little earlier.

THE COURT: That totals 6100—well, that figure is $6150, and you add the 520 to it, indicates to me that she's entitled to a judgment of $6,670.

Ms. Butler, I think, should be allowed basically a similar figure of five dollars a day for the inconvenience, and she was there, as I understand it, about a year. That translates into $1,825.

Incidentally, in regard to Ms. Butler and her children and Mr. Gravatt, I did not deduct anything for the fact that they got cheap rent, feeling, as was argued, that that was a collateral issue and a collateral source that should not be considered here. That was nothing that was provided to them by the defendants.

With Ms. Butler, that translates out to $1,825.

Now, in regard to Allen and Aaron, we have testimony not from Aaron, but from Allen and from other members of the family about the inconvenience and about the problems that they suffered. It seems to me that these young men did not suffer to

the same degree that their mother did or that the other adults did in this deal, but nevertheless, they were put to extra trouble in the way that they took baths and water and so forth. I think they are entitled to something for that year that they lived there, and arbitrarily set their damages based on the evidence that I heard at forty dollars a month or five dollars a week or a dollar a day, which would total to—no, that isn't a dollar a day—five dollars a week, roughly, which would translate out to $480 each.

Mr. Gravatt has a little different situation. In regard to this case, Mr. Gravatt may be his own worst enemy because he was able to take things much more in stride, apparently, than some of the other plaintiffs. He was inconvenienced here. I did not consider the fact that he did get low rent or no rent partly because of this problem, but considered—well, I shouldn't say I didn't consider that because in trying to determine what a fair amount is to award for inconvenience, I did consider the issue of how much rent people were paying, but I did not deduct that, believing that it was a collateral source. But I did consider those things.

Rather than five dollars a day for Mr. Gravatt, I have cut it in half. He was away from home more than others, and it just seemed to me he had no kids to take care of in his house, just himself. He was able to arrange to shower elsewhere. That seems to me to be the way he testified about it, the whole thing was just less of a hassle to him than it was to other people, and came to the conclusion that for the 1230 days involved, that at $2.50 a day would be a fair way to approach it, or $3,075 basically for inconvenience.

Now, we must turn to what is probably the most difficult part of this case, which is the emotional distress claims.

In regard to these claims, I want to say a number of things here that are preliminary to conclusions. The first, the evidence in this case is that the probabilities are, and therefore my finding, that there is very little, very, very slight likelihood of any actual harm coming to any plaintiff as a result of consumption of this contaminated water. The government's testimony on that was clear and convincing to me. The risks, in fact, are very slight. That does not change the fact that the perceived risks by these plaintiffs, particularly early on, and continuing up till now, was of a greater harm than the actual risks that occurred. We talked some about foreseeability and whether it had to be a general or special direct foreseeability in this case.

It seems to me that the harm here started, or the injury started when these plaintiffs were told not to drink the water and that it was dangerous. The details of why got somewhat lost in the translation in the early days, and there was a substantial fear and a perception of a substantial risk. We now know that, some of that panic, if you will, fear, was not justified, but we also know, particularly from Dr. DuPont and Dr. Petrich, that the reaction that these plaintiffs had is within the limits of what you can expect of reasonable people and normally reasonably constituted—normally constituted people. This whole area of emotional damage, it seems to me, is really nothing more or less than mental suffering, which has been a part of the law of damages in this state since time immemorial. But we see now that emotional damage not attached to physical injury is an area of law that is undergoing some change, and we know the changes are reflected in the *Hunsley, Cagle, Keytronic, McCray*, and whatever other cases are cited in those cases, it's hard to say exactly. We talked about this, I think, just yesterday. It's hard to say exactly where this will all settle out. At this point, it is clear under the *Hunsley* rule that we discussed—and there's an order on this—that if there are objective symptoms, there can be a recovery for emotional distress or mental suffering, or whatever you want to call it. The *Cagle* case and *Keytronic* tend to indicate that objective symptoms may not be necessary if there is a direct invasion of the body by a particular harmful substance, even without physical injury. They tend to indicate that emotional damage may be recoverable without physical injury for intentional torts or torts founded

on a violation of public policy. So there are some questions here in the law, some areas in the law that it appears are subject to change.

Let's translate those issues into the facts in this case. First, it's clear that the tort here was not intentional. The government didn't set out to violate the law or to poison anybody's well or to contaminate anybody's wells or ground water or anything of the kind. On the other hand, this is the kind of a tort, based on the analysis that I made on the liability phase, that is founded in a public policy type violation, a statutory violation. I have indicated, I think already, that the emotional distress damages claimed here are within the scope of foreseeability, of forseeable harm for this kind of an injury. I don't want to discuss all of that again, but we have discussed that, what I think has already been indicated as my conclusion, that the foreseeability factor was one of general foreseeability rather than specific foreseeability. The emotional distress claims that we have here are certainly within the scope of the kind of harm that one can foresee from the contamination of the well.

I also conclude, and I think I have commented on this before as well, but I would conclude that the plaintiff—the plaintiffs, plural—all of the plaintiffs' emotional distress or mental suffering is the kind of mental suffering that is reasonable under the circumstances. That is, it's within the scope of normal reactions of reasonable people, or you can apply the reasonable person test to this, as Justice Brachtenbach said in the *Hunsley* case.

Now, I want to say a little bit more about that. Not everyone reacts the same to outside influences of any sort, and certainly these plaintiffs did not all act the same, or react the same to this particular stimuli, but it does seem to me, again based on testimony of Dr. DuPont and Dr. Petrich, as well as all the other testimony in the case, that these reactions are the kind of reactions that you can expect a significant percentage of the population to have. These plaintiffs, many of them carried a lot of emotional baggage into this case, as has been discussed, but not to the extent that they reacted to this problem in a way that is beyond the concept of what we would consider normal people. Normal people come in a wide variety of shapes and sizes and emotional makeups. Their reactions have not been what we all might hope they would be. I guess we would all hope that everyone would approach this as Mr. Gravatt has apparently approached it and just simply put it behind him. Perhaps not entirely, but he's done a comparatively good job of it. There may well be other people in the area that are not in court today that have not had this kind of a reaction, but that doesn't mean that no emotional distress is the norm.

In this case, we have an actual invasion of the bodies of the plaintiffs based on consumption of this water.

Lastly, the issue, and one of the major issues here, is whether there were objective symptoms in the plaintiffs that we can point to. This was a requirement in the *Hunsley* case. Whether it's still a requirement based on these other cases is subject to argument, I suppose.

We have a number of definitions of objective symptoms in this case, and I'm afraid—you know, I have seen this over the years, this game played with the words "subjective" and "objective." These are lawyers' words; they're not medical words. Doctors use them loosely, but here we had two physicians come in and testify as to their definition of these terms in very different ways. I hate to turn this kind of an issue into a semantic game. Dr. Petrich gave a broad definition. He talked about signs that you can see or sense with the senses, but he added to that that objective symptoms can also include complaints that are frequent and convincing. Dr. DuPont gave a more narrow definition, simply that it was verified; an objective symptom was one that was verifiable by a second party. It is pretty clear that there are a lot of things that one cannot see readily that nevertheless are verifiable by a second party. It's interesting to note in this regard that the second party does not have to be Dr. Petrich or Dr. DuPont. Objective

symptoms can be seen by family members, by other people. They don't have to be those measured as part of a medical examination.

Now, there is one particular case in Washington that we looked at that has a reasonably good discussion of these terms, and that is *Favor v. Department of Labor and Industries* in 53 Wn.[Wash.]2d 698 [336 P.2d 382]. That's a 1959 case. It arose under a different set of laws, workmen's compensation laws, in this state, and used the term "subjective symptoms," but did not use the term "objective symptoms," but nevertheless, it seems to me, made a stab at defining or differentiating between objective and subjective symptoms. I think it is helpful to add this, out of the law, to the definitions that Dr. Petrich and Dr. DuPont gave—and I'm quoting some language. They didn't say "objective symptoms," but in the scope of the workmen's comp. law, the requirements are often referred to as objective symptoms, and they spoke of those requirements as "injuries must have something tangible about them and a relationship in time and space that is susceptible of investigation." They went on to say that a doctor's opinion must be based on something more—this is in a workmen's comp. case, of course. "... doctor's opinion must be based on something more substantial than subjective symptoms." "Statements [made] by a claimant as to purely subjective conditions, peculiar to himself, do not provide the objective circumstances necessary to establish that a claimant's disease arose naturally and proximately from," in this case, from his employment, or to carry that further, it would be from whatever cause you are investigating.

The basis and background of this whole rule of objective symptom requirements is to be sure that people don't come to court and say, "I hurt," and get money for it when nobody can tell if they really hurt. The law has indicated that there must be something more complete than pure complaints that are unsubstantiated to recover in many different kinds of cases, including workmen's compensation and including,

probably, in this state, emotional distress not tied to physical injuries.

Now, one other thing is important about this examination of the objective/subjective issue, and that is that in an emotional distress case we are relying on the subjective judgment of psychiatrists to reach the question of what is objective. Psychiatry, as I think the evidence clearly shows, is less of an exact science than, for example, orthopedic surgery. There is more judgment, more subjective decision making in the whole process. But our psychiatrists in this case listed specific signs or symptoms, and in particular, Dr. Petrich felt they were measurable, observable, sensible—that is, that could be sensed with the senses—that they were convincing to him, and determined that, in his judgment, these signs or symptoms qualified as objective.

Dr. DuPont's response to that, if you will, or answer was that he agreed, and his exhibits are in evidence as to his findings of signs and symptoms. He agreed that many of these signs and symptoms were real and existing, but did not go so far as to call them objective.

On this particular issue, I am satisfied that Dr. Petrich's analysis is probably the better. There are things that you can measure, like sleeplessness. You cannot measure intrusive thoughts, thoughts that you can't get out of your mind or that keep coming back and causing you trouble. But you can, third parties or second parties can, view and measure sleeplessness and agitation and other outward signs. I am satisfied that all of the plaintiffs have by a preponderance of the evidence proven up some objective symptoms as related to Dr. Petrich, as related to Dr. DuPont, and as related to each other. In particular that is important as to Aaron, whose objective symptomatology was related to his mother and to Allen and that was related in court by them.

Now, as to the diagnosis that the two psychiatrists made, I think it's not very important. I certainly did not buy Dr. Petrich's diagnosis. I think his judgment took him a step beyond the diagnostic manual that was referred to. The diagnosis of Dr.

DuPont that these individuals were not suffering from a mental illness, it seems to me, is simply not very relevant. It's my conclusion that it really doesn't matter what these plaintiffs have or whether you can put a label, a psychiatric label on it or call it a mental illness. That's not the point. The question is whether they suffered some emotional distress, some mental suffering, as a result of these events.

My conclusion from the testimony of both Dr. Petrich and Dr. DuPont is that, yes, these plaintiffs did suffer emotional distress from this circumstance. Each of them did. The differences go to the amount of mental suffering or upset or mental distress, whatever you want to call it, not the fact of it or the fact of the damage caused by this emotional distress.

Now, I'm mindful that in discussing this I am lumping all of the plaintiffs together, and I think at this point that that makes some sense rather than to go individual by individual, but certainly, if you wish to, the testimony of Dr. Petrich and Dr. DuPont is pretty clear on these issues to separate out the specific symptoms and other problems.

Let me simply say that all of the plaintiffs carry some emotional baggage into this case, and in greater or lesser degrees. Of course, we all carry emotional baggage around with us of one kind or another. This particular group of plaintiffs, perhaps, had more baggage along with them coming into this problem than a lot of other individuals, but the fact that they came in bearing some other baggage is not dispositive of anything in particular. It's just something we have to put into the equation. We must bear in mind that the government is not responsible for things not caused by the contamination in these wells. On the other hand, if the contamination in the wells had a greater effect on one person than another, because of an individual's background or circumstances, then the government is responsible for the damages proximately caused, even though there may be some other causes. So that's one of those imponderables that the Court has to try and sort out and differentiate between here.

Among other things that we see among these parties is that they suffered from health problems. That added to their emotional situation, there are health problems not related to the issues in this case. The aging process brings on stress and we change. Ms. Clark indicated either in her testimony or in statements to doctors that she didn't have the urge to go dancing, and so forth, as much as she once did. It's not surprising, Ms. Clark. I don't have the urge to do those things either, but I don't have anything to blame it on except that I'm getting older and I need my sleep. So aging is a factor here. With the children, particularly Allen and Aaron, that are parties to this case, the fact that they are young people and rapidly changing is—you know, it's hard to be a young person, it's hard to grow up, and part of the things that they are going through are the normal kinds of things that teen-agers and young people go through.

Retirement can be a problem. Prior dispute with the government, that the Nojds had, and I guess also that Ms. Clark had regarding provision of utilities, can be stressful and can leave individuals in a position where they are looking for trouble, if you will, and that may have happened here, I'm not really sure. General family problems are a part of what we have seen here among the various people, with the kinds of things we see in families everywhere these days, with divorce and problems with spouses and children and intrafamily relationships and so forth. Financial problems exist here with some of the plaintiffs, some substance abuse, and in general, the other problems of life that people have. The government is not responsible for all of those things, and there is some indication that at least some of the plaintiffs have attempted—not attempted, that's not the right word—but have, as a matter of fact, put all of their problems into the well, and that's not appropriate and the government is not responsible to pay for every problem of life that every plaintiff may have. The issue that I must determine is what was proximately caused by the contamination, and there should not be

damages awarded for things not proximately caused.

Let me again turn to the pattern jury instruction. You know, I refer to these a lot, and part of the reason is because I had a hand in writing them. But in regard to this element of damages, the Court is to consider the nature and extent of the injuries, and the pain and suffering, both mental and physical, experienced and reasonably certain, or with reasonable probability to be experienced in the future. The law further provides that the law has not furnished us with fixed standards by which to measure pain and suffering or disability, and with reference to these things, the Court has to be governed by its own judgment and by the evidence in the case and by the law. A very broad rule of fixing damages. I guess what that amounts to is a very subjective—we've been talking about objective and subjective—is a very subjective or discretionary judgment.

In considering this whole problem, we also have to determine what the prognosis is. Dr. Petrich said basically that these plaintiffs were going to suffer indefinitely into the future, basically—if I understood his testimony, he meant on a permanent basis—from the emotional distress caused as a result of the well contamination. Dr. DuPont thought there would be no future problems. My conclusion, based on that testimony and on everything else I have heard in this case, is that the answer is somewhere in between and will vary from party to party.

I meant to add one other thing in regard to the emotional baggage, as we've called it, or stressors that the parties bring here, is this litigation. There is no doubt that this whole scenario is part of the stress that the various plaintiffs are suffering from. You can argue that the stress of litigation is caused by the harm that gave rise to the litigation. On the other hand, the litigation is something that people do as a matter of choice, and it in and of itself and separately from the underlying harm can be a substantial stressor in the lives of individuals. It seems to me that for some of the plaintiffs, and in particular, the testimony has indicated, that for Mr. Nojd, the litigation has taken on a life of its own, if you will, and that part of the ongoing stress that he feels is a result of his vigorous participation in this litigation.

In regard to prognosis, it's my judgment that there is going to be some ongoing emotional distress and upset over this matter for some of these plaintiffs, but generally they're going to get over this soon, that they will put it behind them as this case winds down and the issue is resolved insofar as it can be resolved, and I think generally the future looks very bright, although there is going to be some undefinable period of time that the emotional distress will continue. Certainly, it's likely to continue longer with Mrs. Nojd and Ms. Clark than anyone else, probably some period of time for Mr. Nojd. A lesser period of time for the three daughters, and much less than that for Mr. Gravatt and the two boys. I wish I could put a date on it. I guess I would like to say that now we have been to court and the plaintiffs have all heard from the experts what the risks really are and they should realize that the risks are so slight as to not merit further worry or concern. It's easier to say that than it is for them to live it because what they fear here and what has caused this emotional distress is the unknown, and what's caused it are the questions that the government cannot answer specifically. The government deals in probabilities, and that's what their testimony was, and the probabilities are that the risks are slight, but no one can say for certain what the long term results are going to be. All we can say is that probably there will be no results.

Well, based on all of those considerations and a consideration of each individual plaintiff's situation, I came to these numbers: It appears to me that Mrs. Nojd is entitled to damages for emotional distress of $25,000. For Mr. Nojd, $15,000. For the two Nojd daughters, Norma and Marta, $5,000 apiece. For Ms. Clark, $25,000. For Ms. Butler, Ms. Clark's daughter, $5,000. For Aaron and Allen and Mr. Gravatt, all the same, whose reaction has been much less and less distressful and serious, $1,000 apiece.

What these judgments total up to is as follows, Adding in the things that I have ruled on before the emotional distress:

For Mr. and Mrs. Nojd in regard to rentals and real estate diminution, $25,915. For Mr. Nojd individually, $21,445. That's in addition to the rental and real estate damage. And for Mrs. Nojd, in addition to the rental and real estate damage, $30,925. For Norma, $5,000. For Marta, $5,000. For Ms. Clark, totaling all damages, including the rental and real estate in one lump, would be $71,057. For Ms. Butler, $6,825. For Aaron, $1,480. For Allen, $1,480. For Mr. Gravatt, $4,075.

The last thing I want to say is consideration of the future injury, if any. We did not consider, nor have I ruled on the question of whether there will be any future physical injury. There has been no physical injury in regard to any plaintiff up until this time based on the evidence produced in court. I am not attempting to rule into the future in that regard, and I think the record should be clear that we have not considered in this case or made a ruling as to physical injuries that could possibly arise in the future. I have certainly indicated that the probabilities are at this point that they will not, but I have not granted damages for any risk of future harm or future risks—future actual risks.

Now, in regard to closing this matter out, the plaintiffs should prepare appropriate, I hope, findings and conclusions and present them to the defendant's counsel. I want the defendant's counsel to respond, if they choose to, by reference to the plaintiffs proposals. That is, refer to the paragraph and line and either tell me what's wrong or offer a substitute. I have found that it is almost impossible to do a good job with findings and conclusions if you get two entirely separate sets with entirely separate formats. It just becomes an impossible job. So we will trust that the plaintiffs will do a good job on format and that the defendants can respond by using the plaintiffs' format.

Please bear in mind that while it's my practice to include in the preamble that the oral opinions of the Court are incorporated by reference. I have not attempted to make findings on every specific fact that you will want to add, but I think the findings I have made will lead you to the supplemental findings that you may want to add in the written documents.

Please, as part of the findings and conclusions, don't use it as a way to try and change my mind. If you want to try and change my mind, you can do that through other means, but in the findings and conclusions, what I am looking for and what I want is findings that reflect the opinions that I have rendered, and I don't want to use the settling of findings and conclusions as an exercise in reconsideration. That's not to say that it's inappropriate to point out that you think something is not supported by the evidence or that, whatever, but it doesn't do me much good to have a set of findings submitted now that is what one party or the other wishes my judgment had been. They need to reflect what it is.

I would like to provide a time limit on that without unduly limiting counsel.

Give me a realistic time, counsel, of when you can have your proposals in the hands of the government?

MR. LORD: How does two weeks sound, Judge?

THE COURT: You don't have another case to start tomorrow like I have? We're going to fight the asbestos war in here starting tomorrow.

MR. LORD: We do have extensive findings that have already been proposed to the Court. I think for us to go back and prepare the notes and to get them to counsel—

THE COURT: If you can do them in two weeks, that's fine with me. But I know at the end of a trial lawyers usually have a terrific stack on their desks at the office, too.

MR. LORD: If you want to give us more time.

THE COURT: I want to give you what is reasonable. My dad taught me that the time to prepare findings is before you pick up anything else. Go back to your office

and do it right then, it would be a lot easier than to do it later. Two weeks I assume is reasonable.

MR. KELLY: I assume that's just for you?

MR. LORD: That's just for us to get it to the government. I think we can do it in two weeks.

THE COURT: Where's my calendar? What day is this? January—

THE CLERK: 7th.

THE COURT: 8th? Yeah, 8th.

THE CLERK: 7th.

MS. KILLEFER: 7th.

THE COURT: What day is this? I'm looking at last year.

Yes, this is January 7th. Let's say by the 23rd, two weeks from Friday, have these proposals in the hands of the government.

Mr. Kelly, how much time do you want to respond?

MR. KELLY: About the same, Your Honor, about two weeks would be fine, I think.

THE COURT: February 6? Let's make it February 9, and we will calendar it ahead to February 9 and expect to have both proposals and responses on my desk by the 9th of February, and we will try and get the matter closed out as soon after that as our calendar allows.

All right?

Thank you, counsel.

(Court adjourned at 10:45 a.m.)